IN THE UNITED STATES DISTRICT COURT 
 FOR THE MIDDLE DISTRICT OF ALABAMA 
 NORTHERN DIVISION 

SHARON MOTLEY, ) 
 ) 
 Plaintiff, ) 
 ) 
 v. ) CASE NO. 2:19-CV-478-WKW 
 ) [WO] 
HAL TAYLOR, in his official ) 
capacity as Secretary of the Alabama ) 
Law Enforcement Agency, ) 
 ) 
 Defendant. ) 

 MEMORANDUM OPINION AND ORDER 
 TABLE OF CONTENTS 

I. INTRODUCTION — 3 
II. JURISDICTION AND VENUE — 4 
III. STANDARD OF REVIEW— 4 
IV. BACKGROUND — 6 
 A. Alabama’s Driver’s License-Suspension Scheme — 6 
 1. Receiving a Traffic Ticket — 6 
 2. The State’s Changes to the Traffic Ticket System — 7 
 3. Courts’ Authority to Impose Fines and to Suspend Licenses — 8 
 a. Courts’ Authority to Impose Fines — 8 
 b. Courts’ Authority to Suspend Driver’s Licenses — 9 
 4. Implementing Court-Ordered Suspensions — 9 
 B. Plaintiff Sharon Motley — 11 

 C. The Claim — 11 
V. DISCUSSION — 13 
 A. Distinguishing Plaintiff’s Legal Theories — 14 

 B. The Nature of a Bearden Claim — 18 
 C. Mootness — 22 
 D. Statute of Limitations — 27 
 E. Laches — 39 

 F. The Merits — 49 
 1. Equal Protection — 49 
 a. Heightened Scrutiny — 50 

 i. Jones Step 1 — 51 
 ii. Walker’s “Absolute Deprivation” Test 
 (Jones Step 1.5) — 59 
 b. Rational Basis Review — 62 

 2. Procedural Due Process — 69 
 a. Notice — 71 
 b. Opportunity to be Heard — 73 

VI. CONCLUSION — 78 
 I. INTRODUCTION 
 Plaintiff Sharon Motley is one of an estimated twenty-three thousand 

Alabamians whose licenses are suspended for failing to pay traffic tickets. She 
regularly faces difficult choices about how she will secure and retain employment, 
apply for housing, cash checks, and access medical care. Before the court are 
Plaintiff’s motions for class certification (Doc. # 5) and for a preliminary injunction 

(Doc. # 3), which seek to put herself and similarly situated Alabamians back in the 
driver’s seat. Defendant’s motion to dismiss the complaint (Doc. # 14) seeks to 
maintain the State’s policy choice to keep these drivers off the road until their debts 

to the public fisc are paid. While the burdens Plaintiff bears are substantial, the 
Constitution does not provide her relief. Therefore, Defendant’s motion to dismiss 
is due to be granted, and Plaintiff’s motions are due to be denied as moot. 
 Plaintiff seeks a preliminary injunction (Doc. # 3) to prohibit Defendant Hal 

Taylor, head of the Alabama Law Enforcement Agency (ALEA),1 from enforcing 
an Alabama rule that authorizes state courts to suspend indigent individuals’ driver’s 
licenses without finding that they willfully refused to pay. Plaintiff’s preliminary 

injunction motion further seeks to require the State to reinstate licenses suspended 
under this rule and to notify affected individuals. Finally, Plaintiff moves to certify 

 1 Because Plaintiff sues Mr. Taylor in his official capacity, the court will refer to Mr. 
Taylor as “Defendant” or “the State.” 
a class of similarly situated individuals. (Doc. # 5.) The State moved to dismiss 
(Doc. # 14) on procedural and jurisdictional grounds, as well as on the merits. This 

opinion addresses those motions. 
 II. JURISDICTION AND VENUE 
 Because this case involves a constitutional challenge to state actions, subject 
matter jurisdiction is proper under 28 U.S.C. § 1331 (federal question). The parties 

do not dispute personal jurisdiction or venue. 
 III. STANDARD OF REVIEW 
 A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) “tests the 

sufficiency of the complaint against the legal standard set forth in Rule 8: ‘a short 
and plain statement of the claim showing that the pleader is entitled to relief.’” 
Wilborn v. Jones, 761 F. App’x 908, 910 (11th Cir. 2019) (per curiam) (quoting Fed. 
R. Civ. P. 8(a)(2)). “To survive a motion to dismiss, a complaint must contain 

sufficient factual matter, accepted as true, to ‘state a claim to relief that is plausible 
on its face.’” Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. 
Twombly, 550 U.S. 544, 570 (2007)). “A claim has facial plausibility when the 

plaintiff pleads factual content that allows the court to draw the reasonable inference 
that the defendant is liable for the misconduct alleged.” Id. This standard “is not 
akin to a ‘probability requirement,’ but it asks for more than a sheer possibility that 
[the] defendant has acted unlawfully.” Id. (quoting Twombly, 550 U.S. at 556). “For 
purposes of Rule 12(b)(6) review, . . . a court generally may not look beyond the 
pleadings.” United States ex rel. Osheroff v. Humana Inc., 776 F.3d 805, 811 (11th 

Cir. 2015). This court has adhered to this rule, except that it has considered two 
specifically identified facts that are properly the subject of judicial notice. See infra 
pp. 28–30 & n.11, 55 n.15. 

 The State challenges the court’s subject matter jurisdiction by arguing that the 
case has been mooted by a subsequent revision to the statewide traffic ticket. An 
attack on subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) 
may be either a facial attack or a factual attack. Lawrence v. Dunbar, 919 F.2d 1525, 

1528–29 (11th Cir. 1990) (per curiam). A facial attack simply challenges the 
sufficiency of the plaintiff’s jurisdictional allegations, which are taken as true. Id. 
at 1529. Factual attacks challenge “the existence of subject matter jurisdiction in 

fact, irrespective of the pleadings, and matters outside the pleadings, such as 
testimony and affidavits, are considered.” Id. (quoting Menchaca v. Chrysler Credit 
Corp., 613 F.2d 507, 511 (5th Cir. 1980)). Defendant brings a factual attack on 
jurisdiction that requires the court to look beyond the allegations of the complaint 

and to the evidence presented by the parties. See MSPA Claims 1, LLC v. Tenet Fla., 
Inc., 918 F.3d 1312, 1319 (11th Cir. 2019). Thus, in deciding the mootness issue 
raised by Defendant’s motion, the court has reviewed all the evidence presented by 

the parties. Accordingly, the facts recounted and documents referenced in Parts 
IV.A.1. and 2. are considered solely for the purposes of deciding the 12(b)(1) 
motion. 

 IV. BACKGROUND 
A. Alabama’s Driver’s License-Suspension Scheme 
 1. Receiving a Traffic Ticket 

 Alabama police officers are required by statute to use a uniform traffic ticket. 
See Ala. Code § 12-12-53(a). That statute is implemented by Alabama Rule of 
Judicial Administration 19(A), which the Alabama Supreme Court promulgates. 
Rule 19(A) provides what each traffic ticket must contain and includes the standard 

ticket form, called Form UTTC-1. Form UTTC-1 (Series N) was the standard traffic 
ticket throughout the state when Ms. Motley received her ticket in 2013. (Doc. # 7-
20, at 2–3; Doc. # 1, ¶ 33, at 9.)2 

 The Series N ticket has a section entitled “NOTICE,” which gives 
“INSTRUCTIONS TO THE DEFENDANT.” The notice states that the defendant 
must appear in court on a given date unless he or she has already settled the case. It 
states that if the defendant fails to appear, the Department of Public Safety will be 

notified to suspend his or her license. (Doc. # 7-20, at 14.) Series N does not give 

 2 All citations to the record refer to the CM/ECF page numbers in the heading of each 
document. 
notice that defendants who fail to pay their fines are subject to license suspension. 
(Doc. # 7-20, at 3, 14.) 

 2. The State’s Changes to the Traffic Ticket System 
 On January 26, 2018, the Standing Committee on the Alabama Rules of 
Judicial Administration recommended that the Alabama Supreme Court amend Rule 

19(A) and the UTTC-1 ticket to include language notifying individuals who received 
traffic tickets that their licenses are subject to suspension for failure to pay fines or 
to enter into court-approved payment plans. On May 9, 2018, the Alabama Supreme 
Court entered an order amending Rule 19(A) to include the Standing Committee’s 

proposed language. (Doc. # 7-20, at 3.) 
 On August 10, 2018, the Standing Committee recommended that the court 
adopt an updated Form UTTC-1 that includes: (1) the new notice language already 

approved by the court and (2) several corrective changes, such as replacing 
references to the “Department of Public Safety” with the “Alabama Law 
Enforcement Agency.” Form UTTC-1 (Series P) contains the additional notice 
language approved by the court in the amendments to Rule 19(A). (Doc. # 7-20, 

at 4.) 
 Form UTTC-1 (Series P) was approved by the Alabama Supreme Court on 
November 30, 2018. (Doc. # 7-20, at 4.) Series P is now the operative uniform 

traffic ticket in Alabama. 
 3. Courts’ Authority to Impose Fines and to Suspend Licenses 
 a. Courts’ Authority to Impose Fines 

 Alabama Rule of Criminal Procedure 26.11 (the “Rule”) governs fines and 
restitution orders in state courts.3 Rule 26.11(b) provides that courts, in deciding 
whether to impose a fine, “should consider” five factors, including “the financial 

resources and obligations of the defendant and the burden that payment of a fine will 
impose,” as well as the “ability of the defendant to pay a fine forthwith on an 
installment basis or on other conditions to be fixed by the court.” Ala. R. Crim. P. 
26.11(b)(2), (3) (emphasis added). If the defendant cannot pay the fine 

“immediately after pronouncement of the sentence as preferred, the court may permit 
payment . . . at some later date, or in specified installments.” Ala. R. Crim. P. 
26.11(d). 

 If the defendant fails to pay a fine, the court “may inquire and cause an 
investigation to be made into the defendant’s financial, employment, and family 
standing, and the reasons for nonpayment of the fine,” including whether 
nonpayment “was contumacious or due to indigency,” — that is, whether the 

defendant willfully chose not to pay or was simply too poor. Ala. R. Crim. P. 
26.11(g) (emphasis added). The words should and may, when read in their ordinary 

 3 “Rule 26.11 is taken from the ABA Standards for Criminal Justice, Sentencing 
Alternatives and Procedures 18-2.7 (2d ed. 1986).” Ala. R. Crim. P. 26.11 committee comments. 
sense, mean that courts are not required to consider the indigency of the defendant 
in deciding whether to impose a fine or in determining why a fine has not been paid.4 

 b. Courts’ Authority to Suspend Driver’s Licenses 
 “If the court orders a defendant to pay a fine and/or restitution imposed as a 
result of a traffic infraction, the court may suspend the defendant’s privilege to 

operate a motor vehicle in this state upon a failure of the defendant to comply with 
the order of the court” — that is, when the defendant fails to pay the fine. Ala. R. 
Crim. P. 26.11(i)(3). And “[i]f the defendant’s privilege to operate a motor vehicle 
has been suspended for failure to comply with such court order, the privilege may 

remain suspended until the total amount of the fine and/or restitution imposed is 
paid.” Id.; (see also Doc. # 1, ¶ 18 n.10, at 6 (“Although the Rule talks about ‘fine 
and/or restitution imposed as a result of a traffic ticket,’ the majority of traffic tickets 

in Alabama do not result in restitution. Even Defendant’s own policy statement 
references only unpaid ‘fines and court costs.’” (citation omitted).) 
 4. Implementing Court-Ordered Suspensions 
 To effectuate a license suspension, the court sends a form, called a UTC-25, 

to the Alabama Law Enforcement Agency (“ALEA”).5 (Doc. # 1, ¶ 26, at 7–8.) 

 4 The parties have not cited, and the court has not found, an Alabama case construing the 
language in Rule 26.11(b) as mandatory. 
 5 ALEA includes the Department of Public Safety and the State Bureau of Investigations. 
See Ala. Code § 41-27-1. 
“Form UTC-25 authorizes judges to order the suspension of a driver’s license for 
nonpayment after making a finding that a motorist was ordered to pay a fine, court 

costs and/or restitution and failed to pay.” (Doc. # 1, ¶ 29, at 8 (citation and internal 
quotation marks omitted).) ALEA then mails a notice to the defendant that his or 
her license has been suspended. “The Suspension Notice states that the motorist’s 

driver’s license will remain suspended for an ‘indefinite’ duration until he or she 
pays ‘the outstanding fine and/or court costs,’ the court mails Form UTC-25 to 
ALEA as proof of payment, and the motorist pays a $100 reinstatement fee.” (Doc. 
# 1, ¶ 31, at 8–9 (citation omitted).) “The letter does not provide motorists with any 

notice about the possibility of a hearing to contest the suspension because the 
motorist is indigent and unable to pay.” (Doc. # 1, ¶ 31, at 9.) 
 Defendant Hal Taylor, as head of ALEA, is tasked with administering and 

enforcing the laws governing motor vehicles in the state. See Ala. Code §§ 32-2-5, 
41-27-2(a). “He establishes general policies and oversees the actions of the agency, 
including those related to driver’s license suspensions.” (Doc. # 1, ¶ 24, at 7.) 
ALEA’s written “policy documents state that ‘[i]t is the policy of the Director and 

the Driver License Division [of ALEA] that any person’ who ‘fails to pay’ will have 
their [sic] driver’s license ‘suspended until . . . the fines and court costs have been 
paid.’” (Doc. # 1, ¶ 25, at 7 (citation and internal quotation marks omitted).) 
B. Plaintiff Sharon Motley 
 Plaintiff Sharon Motley lives in Montgomery, Alabama. Her license is 

currently suspended for failing to pay “a traffic ticket that she received in the 
Montgomery County District Court in 2013.” (Doc. # 1, ¶ 33, at 9.)6 Ms. Motley 
claims that she cannot afford to pay her ticket and that, for this reason only, her 

driver’s license remains suspended. (Doc. # 1, ¶ 33, at 9.) This suspension has made 
it difficult for Ms. Motley to secure and retain employment, apply for housing, cash 
checks, and obtain medical care. (Doc. # 1, ¶¶ 35–36, at 9.) 
C. The Claim 

 On July 3, 2019, Plaintiff filed this lawsuit, alleging that the State’s 
suspension of her license violates the Fourteenth Amendment’s guarantees of due 
process and equal protection. (Doc. # 1, at 13, 15.) Her brief in response to 

Defendant’s motion to dismiss explains that her claim is founded on the doctrine of 
Bearden v. Georgia, 461 U.S. 660 (1983), and its associated cases. Bearden held 
that, before ordering imprisonment for failure to pay a fine, a sentencing court must 
determine whether an indigent probationer willfully refused to pay and, if his 

inability to pay was through no fault of his own, must consider alternative measures 
of punishment. Id. at 672. 

 6 Oddly, Ms. Motley does not plead the date of the suspension. 
 “Due process and equal protection principles converge” to protect indigent 
defendants from imprisonment solely because of their inability to pay fines. Id. at 

665. The principle that the states must provide “equal justice for poor and rich, weak 
and powerful alike,” Griffin v. Illinois, 351 U.S. 12, 16 (1956), “has not been 
confined to cases in which imprisonment is at stake,” M.L.B. v. S.L.J., 519 U.S. 102, 

111 (1996). Plaintiff seeks to extend Bearden to protect indigent persons from 
having their driver’s licenses suspended without a finding that they willfully failed 
to pay. 
 Plaintiff’s claim, brought on behalf of all similarly situated persons, is based 

on the State’s suspension of their driver’s licenses under Rule 26.11(i)(3) “without 
prior notice, the opportunity to be heard, and an express finding that the individual 
is able to pay and willfully failed to do so.” (Doc. # 1, ¶ 56, at 14.) She alleges that 

“[n]either the [Montgomery District C]ourt nor ALEA gave her notice that her 
driver’s license could be suspended for nonpayment, that her ability to pay is a 
critical issue in determining the appropriateness of suspension or conducted an 
ability to pay hearing prior to the suspension.” (Doc. # 1, ¶ 34, at 9.) Plaintiff seeks 

a declaration that “that Rule 26.11(i)(3) of the Alabama Rules of Criminal Procedure 
violates the Equal [P]rotection and Due Process Clauses of the Fourteenth 
Amendment by suspending a motorist’s driver’s license for nonpayment without 

prior notice, the opportunity to be heard, and an express finding that the motorist is 
able to pay and willfully failed to do so.” (Doc. # 1, at 15.) Plaintiff also seeks to: 
(1) enjoin ALEA from suspending licenses under Rule 26.11(i)(3) for nonpayment, 

(2) require ALEA to reinstate licenses that were suspended for nonpayment 
(assuming there is no other reason for suspension) without charging a reinstatement 
fee, and (3) require ALEA to provide notice to the drivers who are eligible to have 

their licenses reinstated. (Doc. # 1, at 15.) This court dismissed a previous attempt 
to bring this claim because the named plaintiffs (including Ms. Motley) lacked 
standing to challenge their suspensions where their licenses were suspended for a 
secondary reason that was not redressable by the court. See Cook v. Taylor, No. 

2:18-cv-977-WKW, 2019 WL 1938794 (M.D. Ala. May 1, 2019). 
 V. DISCUSSION 
 In its motion to dismiss, Defendant argues that all of Plaintiff’s claims are 

mooted by the implementation of the Series P traffic ticket, that the statute of 
limitations has run on all claims, and that all claims are barred by laches. 
Additionally, Defendant challenges the merits of Plaintiff’s claims under both equal 
protection and procedural due process frameworks. 

 One issue can be disposed of at the threshold. Defendant originally argued 
that the Rooker-Feldman doctrine barred Plaintiff’s claims. (Doc. # 16, at 18–21.) 
Plaintiff clarified that she was only bringing facial claims to Rule 26.11(i)(3) and 

not an as-applied challenge to her suspension order. (Doc. # 21, at 22–24.) 
Defendant then conceded that these facial claims are not barred by Rooker-Feldman. 
(Doc. # 22, at 8–10.) The court agrees, so this issue warrants no further discussion. 

A. Distinguishing Plaintiff’s Legal Theories 
 While Plaintiff has pled a single claim for relief, that claim references five 
distinct injuries that rely on legal theories of either equal protection or procedural 

due process. Four of these injuries are intertwined with each other because they are 
founded on the Griffin/Bearden line of cases, which allows Plaintiff to seek relief 
through one hybrid equal protection/due process theory. The equal protection 
component of this theory is a necessary condition for a Bearden claim. Plaintiff 

adequately alleges such a component by claiming that “Alabama Rule of Criminal 
Procedure 26.11(i)(3) violates Plaintiff’s rights under the Fourteenth Amendment to 
the U.S. Constitution by authorizing courts to suspend any motorist’s driver’s license 

for nonpayment of fines, restitution and/or court costs without . . . considering the 
reason for nonpayment[] and without determining if the motorist willfully refused 
to pay.” (Doc. # 1, ¶ 60, at 14.) Assuming this principle to govern, Plaintiff alleges 
that Defendant’s enforcement of Rule 26.11(i)(3) violated her Fourteenth 

Amendment procedural due process rights and injured her in three ways: 1) that 
“[n]either the court nor ALEA gave her notice . . . that her ability to pay is a critical 
issue in determining the appropriateness of suspension” 2) that “[n]either the court 

nor ALEA . . . conducted an ability to pay hearing prior to the suspension,” and 
3) that her license has been suspended without a finding that she had the ability to 
pay.7 (Doc. # 1, at 9.) She argues that Rule 26.11(i)(3) is facially unconstitutional 

because it authorizes suspensions without requiring the State to provide these 
protections. Whether these procedural due process injuries can constitute grounds 
for relief depends upon whether Plaintiff prevails on her equal protection argument, 

because if the State was not required to consider Plaintiff’s reason for nonpayment, 
then Plaintiff cannot be entitled to procedures that enable her to assert her indigence. 
Therefore, these arguments constitute one blended Bearden claim because they 
depend upon an allegation that the “State is treating the indigent and the non-indigent 

categorically differently.” Walker v. City of Calhoun, 901 F.3d 1245, 1260 (11th 
Cir. 2018). 
 Despite Plaintiff’s protest that “there is no separate procedural due process 

claim,” (Doc. # 21, at 13), Plaintiff alleges that Defendant’s enforcement of Rule 
26.11(i)(3) violated her procedural due process rights and injured her in in a manner 
that is unrelated to her Bearden claim: “[n]either the court nor ALEA gave her notice 
that her driver’s license could be suspended for nonpayment.” (Doc. # 1, ¶ 34, at 9.) 

She argues that Rule 26.11(i)(3) is facially unconstitutional because it authorizes 
suspensions without requiring the State to give individual notice of this possibility. 

 7 The third injury is stated in the subheading for Part IV.D. of the complaint. (Doc. # 1, at 
9.) The court assumes, without deciding, that Plaintiff adequately alleged that she suffered this 
injury. 
This notice injury supports a pure procedural due process claim, not a Bearden claim, 
because Plaintiff could obtain relief under this theory even if the Equal Protection 

Clause does not require the State to consider Plaintiff’s reasons for nonpayment. 
Plaintiff’s complaint and briefing repeatedly attempt to conflate her two notice 
injuries by alleging that “Rule 26.11(i)(3) of the Alabama Rules of Criminal 

Procedure violates the Equal [P]rotection and Due Process Clauses of the Fourteenth 
Amendment by suspending a motorist’s driver’s license for nonpayment without 
prior notice . . . .” (Doc. # 1, at 15; see also, e.g., Doc. # 1, at 1, 6, 10, 11, 14; Doc. 
# 21, at 13, 24.) Even under Plaintiff’s broad definition of a Bearden claim, this 

notice failure is not an “adverse consequence” imposed “against indigent defendants 
solely because of their financial circumstances.” (Doc. # 21, at 9.) 
 Plaintiff appears to recognize that this notice injury is separate from the notice 

injury underlying her Bearden claim. (See Doc. # 21, at 15 (“Defendant argues that 
the State is not legally required to provide individual notice because Motley had 
statutory notice that her license could be suspended for nonpayment. Such statutory 
notice, however, is inadequate if Plaintiff prevails on her claim that it violates the 

Fourteenth Amendment to suspend a license unless a driver willfully failed to 
pay . . . .” (citation omitted)).) The clearest evidence that these legal theories are 
separate is in Plaintiff’s discussion of Turner v. Rogers, 564 U.S. 431 (2011). 

Plaintiff quotes Cleveland v. City of Montgomery for its finding that “Turner 
expanded on Bearden by defining an indigent person’s due process rights under the 
Fourteenth Amendment when facing civil contempt . . . includ[ing] (1) notice to the 

defendant that his ability to pay is a critical issue in the contempt proceedings; . . . .” 
(Doc. # 21, at 13 (quoting Cleveland v. City of Montgomery, No. 2:13-CV-732-
MHT, 2014 WL 6461900, at *4 (M.D. Ala. Nov. 17, 2014).)8 

 Plaintiff’s choice to plead a single claim for relief adds unnecessary confusion 
to this case. But because her claim for relief arises from a single transaction—the 
suspension of her driver’s license for nonpayment of traffic fines—Plaintiff is not 
required to amend her complaint to separate this theory into an additional count. See 

Fed. R. Civ. P. 10(b) (“If doing so would promote clarity, each claim founded on a 
separate transaction or occurrence . . . must be stated in a separate count . . . .”); Fed. 
R. Civ. P. 8(d)(2) (“A party may set out 2 or more statements of a claim or defense 

alternatively or hypothetically, either in a single count or defense or in separate ones. 
If a party makes alternative statements, the pleading is sufficient if any one of them 
is sufficient.”); Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1247 (11th Cir. 
2004) (“While it may well be preferable to plead different theories of recovery in 

separate counts, it is not required.”); Cole v. United States, 846 F.2d 1290, 1293–94 
(11th Cir. 1988) (acknowledging the existence of two legal theories within Plaintiff’s 

 8 As explained in Part V.F.1.a.i., the court does not share Plaintiff’s belief that Turner 
expands Bearden to the civil contempt context. 
single count and analyzing their merits separately). However, distinguishing this 
legal theory from Plaintiff’s Bearden hybrid theory has important ramifications for 

the disposition of Defendant’s jurisdictional and procedural objections. See also 
infra note 12 (finding, in the alternative, that even if Plaintiff were required to 
separate these theories into two counts, amending the complaint would be futile). 

B. The Nature of a Bearden Claim 
 To understand the jurisdictional and procedural issues, it is helpful to first 
understand the curious nature of a Bearden claim. Bearden held that, before ordering 
imprisonment for failure to pay a fine, a sentencing court must determine whether 

an indigent probationer willfully refused to pay and, if his inability to pay was 
through no fault of his own, must consider alternative measures of punishment. 461 
U.S. at 672. Bearden built on a line of cases (often called the Griffin line after the 

first case in it) addressing discrimination against indigents in criminal proceedings, 
generally through an equal protection lens. See infra Part V.F.1.a.i. (discussing the 
contexts to which Griffin’s and Bearden’s principles have been extended). Bearden 
elaborated on this doctrine by holding that “[d]ue process and equal protection 

principles converge in the Court’s analysis in these cases.” Id. at 665. Instead of 
slotting Bearden claims into an existing mode of analysis, the Court asserted that 
this type of “issue cannot be resolved by resort to easy slogans or pigeonhole 

analysis, but rather requires a careful inquiry into such factors as ‘the nature of the 
individual interest affected, the extent to which it is affected, the rationality of the 
connection between legislative means and purpose, [and] the existence of alternative 

means for effectuating the purpose . . . .’” Id. at 666–67 (quoting Williams v. Illinois, 
399 U.S. 235, 260 (1970) (Harlan, J., concurring)). 
 Because of the hybrid nature of this claim, courts have varied in their 

analytical approaches to Bearden claims. Bearden itself applied more of a due 
process approach. Id. at 666 n.8. The Eleventh and Fifth Circuits have vacillated 
between analyzing Bearden claims either under equal protection or procedural due 
process standards, and they have often assessed claims under both approaches.9 

 For example, one of the Eleventh Circuit’s recent Bearden cases involved a 
challenge to a city’s policy of detaining indigent arrestees for up to forty-eight hours 
before a judge would assess their indigency and decide whether to release them on 

a recognizance bond. Walker v. City of Calhoun, 901 F.3d 1245, 1252–53 (11th Cir. 
2018). The Circuit held that the district court “was wrong to apply heightened 
scrutiny from traditional equal protection analysis” and held that the question at bar 
“should be evaluated along something akin to a traditional due process rubric.” Id. 

 9 Some courts view Bearden as a mix of equal protection and substantive due process. 
See, e.g., Johnson v. Jessup, 381 F. Supp. 3d 619, 629 (M.D.N.C. 2019); Mendoza v. Garrett, 358 
F. Supp. 3d 1145, 1163 (D. Or. 2018); Robinson v. Purkey, 326 F.R.D. 105, 153 (M.D. Tenn. 
2018). But this approach does not merit further discussion because Plaintiff’s claim was not so 
pled and because the Eleventh Circuit has blessed a hybrid equal protection and procedural due 
process approach. 
at 1265. Due process made “particular sense in [that] case because the relief Walker 
[sought] [wa]s essentially procedural: a prompt process by which to prove his 

indigency and to gain release.” Id. 
 Still, the opinion in Walker does not lose sight of the equal protection harms 
inherent in any Bearden claim. 

 The sine qua non of a Bearden . . . claim, then, is that the State is 
 treating the indigent and the non-indigent categorically differently. 
 Only someone who can show that the indigent are being treated 
 systematically worse “solely because of [their] lack of financial 
 resources,”—and not for some legitimate State interest—will be able to 
 make out such a claim. 

Id. at 1260 (quoting Bearden, 461 U.S. at 661). Additionally, the panel deciding 
Walker was free to focus on the due process question because the former Fifth 
Circuit had already accepted “the principle,” grounded in equal protection, “that 
imprisonment solely because of indigent status is invidious discrimination and not 
constitutionally permissible.” Id. at 1258 (quoting Pugh v. Rainwater, 572 F.2d 
1053, 1056 (5th Cir. 1978)). The panel in Walker was only faced with the procedural 
question of how long the city could delay before granting detainees their 
constitutionally required opportunity to prove their indigency. 
 Defendant interprets Walker as holding that all Bearden claims should be 
analyzed under a procedural due process framework. Walker and the recent case of 
Jones v. Governor of Florida bely this assertion. In Walker, the Eleventh Circuit 
discussed a Fifth Circuit case, ODonnell v. Harris County, which held that the 
indigent plaintiffs, who previously had no meaningful opportunity to obtain pretrial 
release without payment, merited bail hearings after forty-eight hours under both a 

due process analysis and by applying heightened scrutiny. Id. at 1266 n.12 (citing 
ODonnell v. Harris Cty., 892 F.3d 147 (5th Cir. 2018) [hereinafter ODonnell I]); see 
also generally ODonnell I, 892 F.3d 147. The Eleventh Circuit believed that 

heightened scrutiny was inappropriate in Walker because the defendant already 
offered a path to release without payment after forty-eight hours, but it 
acknowledged that Mr. Walker would have had a stronger case for heightened 
scrutiny had the facts been the same as in ODonnell I. 901 F.3d at 1266 n.12; see 

also ODonnell v. Goodhart, 900 F.3d 220, 227 (5th Cir. 2018) [hereinafter ODonnell 
II] (considering a later, more stringent preliminary injunction in the same case and 
deciding that heightened scrutiny did not apply for the same reason as in Walker: 

once the requirement of a hearing is in place, a claim that release is owed before 
forty-eight hours is subject to rational basis review). 
 Any remaining ground that Defendant’s procedural-due-process-only 
interpretation could stand on was eliminated by the Eleventh Circuit’s recent opinion 

in Jones v. Governor of Florida, 950 F.3d 795 (11th Cir. 2020) (per curiam). In that 
case, the plaintiffs challenged a Florida law that interpreted Florida’s new felon-
enfranchisement constitutional amendment to require payment of all fines, fees, and 

restitution before a felon was entitled to re-enfranchisement. Jones, 950 F.3d at 802–
03. The plaintiffs brought separate equal protection and due process claims, and the 
district court only decided the equal protection claim, so the Eleventh Circuit 

likewise analyzed the Bearden claim solely through an equal protection lens. Id. at 
806–07 & n.8. The panel applied heightened scrutiny and affirmed the district 
court’s preliminary injunction barring the defendants from 1) “preventing [the 

plaintiffs] from registering to vote based solely on an inability to pay outstanding 
legal financial obligations, where each plaintiff asserts that he or she is genuinely 
unable to pay” and from 2) “preventing the plaintiffs from actually voting if indeed 
they could establish that they are unable to pay.” Id. at 805, 832–33. As explained 

in the previous section, Plaintiff must prevail on her equal protection argument to 
have a hope of success on her three Bearden-related due process arguments. 
C. Mootness 

 The question of mootness must be addressed first because “mootness is 
jurisdictional.” Al Najjar v. Ashcroft, 273 F.3d 1330, 1336 (11th Cir. 2001). 
 There is thus no case or controversy, and a suit becomes moot, “when 
 the issues presented are no longer ‘live’ or the parties lack a legally 
 cognizable interest in the outcome.” But a case “becomes moot only 
 when it is impossible for a court to grant any effectual relief whatever 
 to the prevailing party.” As “long as the parties have a concrete interest, 
 however small, in the outcome of the litigation, the case is not moot.” 
Chafin v. Chafin, 568 U.S. 165, 172 (2013) (first quoting Already, LLC v. Nike, Inc., 
568 U.S. 85, 91 (2013); and then quoting Knox v. Serv. Emps., 567 U.S. 298, 307–
308 (2012)). Mootness, like other justiciability doctrines such as standing and 
ripeness, plays an important role in ensuring “that the parties involved have 
something real at stake, motivating them to make arguments on both sides.” Susan 

C. Morse & Leigh Osofsky, Regulating by Example, 35 YALE J. ON REG. 127, 163 
& n.173 (2018). 
 Defendant claims that this controversy is moot because Alabama’s traffic 

tickets have been revised to warn recipients of the possibility of automatic license 
suspension for nonpayment of traffic fines and because the tickets now “provide[] 
constitutionally sufficient notice of the recipient’s ability to have his or her ability 
to pay any associated fine taken into account.” (See Doc. # 16, at 30–32 (“[T]he 

language on Alabama’s traffic tickets now includes notice that the recipient’s driver 
license may be automatically suspended if he or she fails to either pay the associated 
fine or appear in court in order to have his or her financial condition individually 

evaluated . . . .”).) Before this suit was filed, the Alabama Supreme Court adopted 
a recommendation from its Standing Committee on the Rules of Judicial 
Administration that the Alabama Uniform Traffic Ticket and Complaint be revised. 
(Doc. # 7-20, at 3–4.) As of November 30, 2018, the new tickets include the 

following instructions, 
 Upon a plea of guilty or a conviction for the offense charged within this 
 complaint, you have 60 days to satisfy any monetary judgment against 
 you. If you cannot pay any monetary judgment against you in 60 days, 
 you may apply to the court to request payment of a monetary judgment 
 in installments. You must obtain a court order approving an installment 
 plan and provide proof of financial responsibility and such an order to 
 the Secretary of the Alabama Law Enforcement Agency within 60 days 
 of the entry of any monetary judgment against you OR YOUR 
 LICENSE WILL BE SUBJECT TO AUTOMATIC SUSPENSION. 

Ala. R. Jud. Admin. 19, Attachment One; (Doc. # 7-20, at 38.) The Series N ticket 
that Ms. Motley received did not contain this, or any similar language. Specifically, 
it did not contain any warning that her license may be suspended for her failure to 
pay, and it did not advise her as to what steps she could take if she was unable to pay 
the judgment. (Doc. # 7-20, at 3, 14; Doc. # 14-1, at 7; Doc. # 1, ¶ 34, at 9.) 
Defendant argues that “the State is already providing Plaintiff with the relief she 
purports to seek, so that this Court can afford her no relief beyond what is already 

being provided.” (Doc. # 16, at 31.) 
 “If events that occur subsequent to the filing of a lawsuit or an appeal deprive 
the court of the ability to give the plaintiff or appellant meaningful relief, then the 

case is moot and must be dismissed.” Al Najjar, 273 F.3d at 1336. While there is 
some overlap between the ticket revision and Plaintiff’s non-Bearden-due-process 
injury, there remains a clear mismatch between the relief that the State is providing 
and the relief that Plaintiff is seeking, which precludes a finding of mootness. 

Plaintiff is not seeking to enjoin a return to the previous ticket form, and her license 
remains suspended after receiving the earlier ticket version. Therefore, the court’s 
ability to grant Ms. Motley meaningful relief is not eliminated by the ticket revision. 
 First, the ticket revision does not provide the relief that Plaintiff is seeking to 
ameliorate her Bearden claims. As discussed in Plaintiff’s mootness arguments, 

Plaintiff seeks to enjoin enforcement of Rule 26.11(i)(3) because its current form 
authorizes suspensions without requiring the constitutionally mandated safeguards 
to which licensees are allegedly entitled. Plaintiff’s Bearden claim is founded on 

the belief that licensees must receive separate notice after they have defaulted on 
payment but before their licenses are suspended. Said notice must offer an ability-
to-pay hearing, inform drivers that their ability to pay will be a “critical issue” in the 
hearing, and inform drivers that their licenses may not be suspended if they are 

unable to pay. (Doc. # 21, at 25–26.) The new ticket language does not provide any 
of those remedies nor does it reinstate Plaintiff’s license, foreclose Plaintiff’s 
requested declaratory relief, or “[p]revent[] ALEA from effectuating driver’s license 

suspensions for nonpayment under Alabama Rule of Criminal Procedure 
26.11(i)(3).” (Doc. # 1, at 15.)10 The question of whether the court should grant 

 10 Defendant argues that even if Plaintiff’s claims were meritorious, she would only be 
entitled to procedural relief and not a blanket injunction barring enforcement of the Rule. 
(Doc. # 16, at 31–32 n.6.) This argument may be correct. See ODonnell I, 892 F.3d at 163 (“The 
fundamental source of constitutional deficiency in the due process and equal protection analyses 
is the same: the County’s mechanical application of the secured bail schedule without regard for 
the individual arrestee’s personal circumstances. Thus, the equitable remedy necessary to cure the 
constitutional infirmities arising under both clauses is the same: the County must implement the 
constitutionally-necessary procedures . . . .”). However, the ticket revision does not implement 
what Plaintiff views as the constitutionally necessary procedures under Bearden, and if she were 
to prevail, an injunction more narrowly tailored to rectify her injuries could be crafted. (See Doc. 
# 1, at 15 (requesting “other relief as the Court deems just and appropriate”)); see also Rondeau v. 
equitable or declaratory relief to rectify Rule 26.11(i)(3)’s alleged shortcomings and 
alter Defendant’s enforcement actions is a question for the merits, not for mootness. 

See Chafin, 568 U.S. at 174 (“Ms. Chafin argues that this case is moot because the 
District Court lacks the authority to issue a re-return order either under the 
Convention or pursuant to its inherent equitable powers. But that argument—which 

goes to the meaning of the Convention and the legal availability of a certain kind of 
relief—confuses mootness with the merits.”). 
 Second, Plaintiff’s non-Bearden due process claim does not seek the form of 
relief offered by this policy change. Therefore, this case does not raise the often-

thorny issue of what to do when a Plaintiff seeks to enjoin or to declare 
unconstitutional a policy that a governmental actor has subsequently repealed. See, 
e.g., Walker, 901 F.3d at 1269–71. Because Plaintiff did not receive the new traffic 

ticket and because her license is still suspended, she has asked for and could merit 
license reinstatement to remedy the State’s alleged failure to provide adequate 
notice. As Plaintiff persuasively argues, “[e]ven if the change were sufficient to 

Mosinee Paper Corp., 422 U.S. 49, 61 (1975) (holding that injunctive relief should be molded to 
the necessities of the particular case); ODonnell I, 892 F.3d at 163–67 (vacating the district court’s 
preliminary injunction as overbroad and remanding with recommendations for crafting a 
preliminary injunction that would require the defendant to provide adequate procedures); Parker 
v. Judicial Inquiry Comm’n of Alabama, 295 F. Supp. 3d 1292, 1309 (M.D. Ala. 2018) (“[B]ecause 
an injunction is a form of equitable relief, ‘a court need not grant the total relief sought by the 
applicant but may mold its decree to meet the exigencies of the particular case.’” (quoting Trump 
v. Int’l Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017) (per curiam) (internal quotation 
marks omitted)). 
satisfy due process”—which she argues it does not—“it leaves unaltered” Plaintiff’s 
claim because she received her ticket before November 30, 2018. (See Doc. # 21, at 

27.) If Plaintiff’s Bearden or due process claims were meritorious, some or all of 
Plaintiff’s requested declaratory or injunctive relief could be effectually granted, so 
Plaintiff’s claims are not moot. 

D. Statute of Limitations 
 Because Plaintiff filed a claim under 42 U.S.C. § 1983 in Alabama, she is 
subject to a two-year statute of limitations. Ala. Code § 6-2-38(l); McNair v. Allen, 
515 F.3d 1168, 1173 (11th Cir. 2008). When that clock starts running is a question 

of federal law. Wallace v. Kato, 549 U.S. 384, 388 (2007). In general, “the statute 
of limitations begins to run from the date ‘the facts which would support a cause of 
action are apparent or should be apparent to a person with a reasonably prudent 

regard for his rights.’” Brown v. Ga. Bd. of Pardons & Paroles, 335 F.3d 1259, 
1261 (11th Cir. 2003) (quoting Rozar v. Mullis, 85 F.3d 556, 561–62 (11th Cir. 
1996)). 
 “[N]ot all injuries are equal. Sometimes, there is one discrete point at which 

the injury occurs. Other times, however, the injury happens over and over again. 
When the injury occurs determines when the statute of limitations starts running.” 
Doe 1 v. Marshall, 367 F. Supp. 3d 1310, 1338 (M.D. Ala. 2019). Plaintiff asserts 

that this continuing violations doctrine applies to extend the time limit for her claims. 
Consequently, it must be determined whether Plaintiff is suffering from “the present 
consequence of a one time violation, which does not extend the limitations period, 

[or] the continuation of that violation into the present, which does.” City of Hialeah 
v. Rojas, 311 F.3d 1096, 1101 (11th Cir. 2002) (quoting Carter v. West Publ’g Co., 
225 F.3d 1258, 1263 (11th Cir. 2000)). 

 “A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate if 
it is apparent from the face of the complaint that the claim is time-barred.” 
Gonsalvez v. Celebrity Cruises, Inc., 750 F.3d 1195, 1197 (11th Cir. 2013) (quoting 
La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004)). While the 

date that Plaintiff’s license was suspended is not apparent from the face of her 
complaint, the court takes judicial notice of the fact that Plaintiff’s license was 
suspended on December 20, 2013. (Doc. # 14-1, at 55.) This fact is derived from 

the Case Action Summary of Plaintiff’s Montgomery County District Court 
proceedings, which is attached to Defendant’s motion to dismiss. It may be 
judicially noticed because it is “not subject to reasonable dispute because it . . . can 
be accurately and readily determined from sources whose accuracy cannot 

reasonably be questioned.” Fed. R. Evid. 201(b). This fact can be accurately and 
readily determined from a public record of state court litigation, a source whose 
accuracy cannot reasonably be questioned. See Osheroff, 776 F.3d at 811–12 & n.4 
(“Courts may take judicial notice of publicly filed documents, such as those in state 
court litigation, at the Rule 12(b)(6) stage.”). 

 The fact of this judicial act is not in dispute. Plaintiff and Defendant have 
each cited this document in their factual summaries as evidence that Plaintiff’s 
license was suspended.11 (Doc. # 16, at 8; Doc. # 21, at 8); United States v. Jones, 

 11 In a footnote of her response brief, Plaintiff disputes Defendant’s interpretation of 
another entry in that same document. (Doc. # 21, at 8 n.3; see also Doc. # 21, at 7–8 n.2.) 
Defendant interprets an entry stating, “SET FOR: PAY DUE DKT/HEARIN [sic] ON 11/19/2013 
@ 0800A,” to mean that Plaintiff had an opportunity to appear in court at that time. (Doc. # 16, 
at 7–8.) Plaintiff’s objection is well-taken, and judicial notice is not taken of this fact because it 
is subject to reasonable dispute and cannot be accurately determined from the source. (Plaintiff’s 
similar objection at footnote 2 of her brief is not styled as a judicial notice objection, (Doc. # 21, 
at 7–8, n.2 (citing Doc. # 16, at 17)), but her concern is noted, and consideration of the facts in 
dispute is not necessary to decide this motion.) 
 Plaintiff concludes footnote 3, which specifically objects to the aforementioned fact, by 
making an ambiguous request: “Were this Court, however, inclined to take judicial notice, 
Plaintiff requests an opportunity ‘to be heard on the propriety of taking judicial notice and the 
nature of the fact to be noticed.’ Fed. R. Civ. P. 201(e).” (Doc. # 21, at 8 n.3.) The court has not 
ignored Plaintiff’s request for a hearing. For the reasons stated in the main text, the court does not 
interpret Plaintiff’s general request to encompass a fact that she has shown to not be in dispute. In 
other words, Plaintiff’s actions have waived a hearing on the propriety of taking notice of the date 
of suspension. (See, e.g., Doc. # 21, at 14 (relying on the 2013 court filings for what they do not 
show: “Defendant’s assertion is factually incorrect because there is no documentation in Motley’s 
court records that the judge made an express ability-to-pay finding . . . .”).) 
 Alternatively, the court may consider this extrinsic document (Doc. # 14-1, at 55) because 
it is “(1) central to the plaintiff’s claim, and (2) its authenticity is not challenged.” SFM Holdings, 
Ltd. v. Banc of Am. Sec., LLC, 600 F.3d 1334, 1337 (11th Cir. 2010); see also Harris v. Ivax Corp., 
182 F.3d 799, 802 n.2 (11th Cir. 1999). 
 To the extent that Defendant’s statements regarding how the court “may take into account” 
or “may take judicial notice” of “court records relating to the traffic case resulting in the suspension 
of Plaintiff’s driver license,” (Doc. # 16, at 6–7 & n.1 (emphasis added)), constitute a broad request 
under Rule 201(c)(2) to take judicial notice of all of the facts contained within these records, that 
request is denied. Such notice is unnecessary to decide this motion. See Fed. R. Evid. 201(c)(2) 
(“The court . . . must take judicial notice if a party requests it and the court is supplied with the 
necessary information.”). To the extent that Defendant’s statement that “the [c]ourt may also 
confirm the applicability of the statute of limitations to Plaintiff’s claims by taking judicial notice” 
constitutes a 201(c)(2) request, (Doc. # 16, at 14–15), that request is granted for the reasons stated 
29 F.3d 1549, 1553 (11th Cir. 1994) (“[A] court may take notice of another court’s 
order only for the limited purpose of recognizing the ‘judicial act’ that the order 

represents or the subject matter of the litigation.”). Plaintiff cites Defendant’s 
exhibit at the page in question for the fact that “the court simply issued a warrant for 
Motley’s arrest and suspended her driver’s license for nonpayment. Doc. 14-1 at 

55.” (Doc. # 21, at 8.) Because there is only one entry on that page relating to 
imposing a suspension, Plaintiff can only be referring to the Alacourt entry stating 
“12/20/13 . . . SUSPENSION NOTICE FOR FTP ISSUED.” In her response brief, 
Plaintiff’s statute of limitations argument does not discuss when the claim first 

accrued or argue that it first accrued during the two years preceding her filing. 
Plaintiff’s argument that the continuing violations doctrine should apply is an 
acknowledgement that she learned or should have learned of her suspension before 

July 3, 2017. 

in the main text. Ultimately, the court does not take judicial notice of any other facts contained in 
Document # 14-1 for the purposes of Defendant’s 12(b)(6) motion because such facts are 
unnecessary to decide this case. 
 Additionally, Plaintiff’s complaint cites several of the exhibits accompanying her motion 
for a preliminary injunction, including Docs. # 7-1, 7-2, 7-3, 7-4, 7-6, 7-7, 7-8, 7-9, 7-10, 7-11, 7-
12, 7-13, 7-14, 7-15, and 7-16. It is not necessary to take judicial notice of facts within these 
documents nor to make a finding regarding whether these documents are properly incorporated by 
reference into Plaintiff’s complaint because viewing the complaint’s allegations of fact as true 
accomplishes the same purpose. It is worth noting that both Plaintiff and Defendant are guilty of 
referencing facts and documents outside the complaint without explaining why the court can 
consider these facts or documents without converting this 12(b)(6) motion into a motion for 
summary judgment. 
 As noted by a district court considering a similar suspension claim, 
“determining whether a particular § 1983 claim presents a continuing violation 

depends, in significant part, on the court’s determining ‘what constitutes the 
defendant’s ‘wrongful conduct’ . . . .” Robinson v. Purkey, 326 F.R.D. 105, 146 
(M.D. Tenn. 2018) (quoting Doe v. Haslam, No. 3:16-CV-02862, 2017 WL 

5187117, at *11 (M.D. Tenn. Nov. 9, 2017)). “Defining the wrongful conduct, in 
turn, ‘is closely related to the nature of the constitutional protection at issue.’ . . . 
[T]he same general pattern of events may present either a continuing or a non-
continuing violation, depending on the constitutional lens through which those 

events are viewed.” Id. (quoting Doe v. Haslam, No. 3:16-CV-02862, 2017 WL 
5187117, at *12 (M.D. Tenn. Nov. 9, 2017)); see also Perez v. Laredo Junior Coll., 
706 F.2d 731, 734–35 (5th Cir. 1983) (holding that a due process claim for the denial 

of a pay raise after attaining a doctoral degree outside the plaintiff’s teaching area 
was a single act, but holding that an equal protection claim for not receiving that pay 
raise while the plaintiff’s employer granted raises to other employees for attaining 
such doctorates could be a continuing violation); Long v. State of Fla., 805 F.2d 

1542, 1546 (11th Cir. 1986) (citing Perez’s continuing violation discussion with 
approval), rev’d on other grounds, 487 U.S. 223 (1988), and abrogated on other 
grounds by Yellow Freight Sys., Inc. v. Donnelly, 494 U.S. 820 (1990); Doe 1, 367 

F. Supp. 3d at 1339 (distinguishing the plaintiffs’ First Amendment compelled 
speech and overbreadth claims, which inflicted new injuries each day, from other 
cases where the plaintiffs complained of being wrongfully registered as sex 

offenders, which accrued when they learned that they had been registered). 
 Plaintiff’s Bearden theory (and its accompanying four injuries) is entitled to 
evaluation under a different constitutional lens from Plaintiff’s non-Bearden 

procedural due process theory. This case poses a particularly tricky statute of 
limitations issue due to the odd nature of a Bearden claim, as detailed in Part V.B. 
On the question of whether the continuing violations doctrine applies, the Supreme 
Court’s command that this “issue cannot be resolved by resort to easy slogans or 

pigeonhole analysis” hitches this court to two doctrines pulling in opposite 
directions. Bearden, 461 U.S. at 666. 
 As illustrated in the parties’ briefs, discrimination claims often qualify as 

continuing violations because each instance of differential treatment is a new injury. 
See, e.g., Calloway v. Partners Nat’l Health Plans, 986 F.2d 446, 449 (11th Cir. 
1993) (“When the claim is one for discriminatory wages, the violation exists every 
single day the employee works.”); Mitchell v. Jefferson Cty. Bd. of Educ., 936 F.2d 

539, 548 (11th Cir. 1991) (“[S]ex based, discriminatory wage payments constitute a 
continuing violation of the Equal Pay Act.” (quoting Hodgson v. Behrens Drug Co., 
475 F.2d 1041, 1050 (5th Cir. 1973))); Perez, 706 F.2d at 734–35 (holding that an 

equal protection claim for not receiving a pay raise after attaining a doctoral degree 
outside the plaintiff’s teaching area while the plaintiff’s employer granted raises to 
other employees for attaining such doctorates could be a continuing violation); Long, 

805 F.2d at 1546 (citing Perez’s continuing violation discussion with approval); 
Robinson, 326 F.R.D. at 146 (holding that the plaintiffs could bring otherwise 
untimely equal protection claims because “the plaintiffs’ injuries include the fact 

that the state’s scheme currently treats them differently from otherwise identical 
non-indigent drivers, by allowing those drivers to have their suspensions lifted by 
making payments that the plaintiffs cannot make”). 
 On the other hand, violations of due process for a property deprivation 

generally begin to run when the property is taken. See, e.g., Hillcrest Prop., LLC v. 
Pasco Cty., 754 F.3d 1279, 1283 (11th Cir. 2014) (holding that a substantive due 
process claim facially challenging an ordinance that decreased the plaintiff’s 

property value accrued when the ordinance passed and immediately reduced the 
property’s value); Lufkin v. McCallum, 956 F.2d 1104, 1106, 1108 (11th Cir. 1992) 
(affirming the district court’s finding of untimeliness in a due process claim when 
the adverse employment action at issue was more than three years before the filing 

date); Doyle v. Univ. of Ala. in Birmingham, 680 F.2d 1323, 1326 (11th Cir. 1982) 
(holding that the plaintiff’s procedural due process claim for the deprivation of a 
property interest “accrued on the date that she was placed on leave or probation 

without a noticed hearing”), superseded by statute on other grounds, Civil Rights 
Restoration Act of 1987, Pub. L. No. 100–259, 102 Stat. 28 (1988), as recognized 
in McMullen v. Wakulla Cty. Bd. of Cty. Commissioners, 650 F. App’x 703, 704–05 

(11th Cir. 2016); Montanez v. Sec’y Pa. Dep’t of Corrs., 773 F.3d 472, 480 (3d Cir. 
2014) (holding that an inmate’s due process claim accrued when he knew or should 
have known that the Department of Corrections had “deprived [him] of his property 

interests, allegedly without due process”); Perez, 706 F.2d at 734 (holding that a due 
process claim for the denial of a pay raise after attaining a doctoral degree outside 
of the plaintiff’s teaching area was a single act); Johnson v. Jessup, 381 F. Supp. 3d 
619, 636 (M.D.N.C. 2019) (assessing the timeliness of due process claims in a 

similar case and finding that “the DMV’s revocation of driver’s licenses is a ‘single 
act’ — the fact that licenses remain revoked thereafter does not evince ‘a series of 
separate acts’ in which the DMV revokes the driver’s licenses anew each day” 

(quoting Nat’l Advert. Co. v. City of Raleigh, 947 F.2d 1158, 1167 (4th Cir. 1991))); 
Robinson, 326 F.R.D. at 145, 148 (dismissing procedural due process claims based 
on suspensions that occurred more than one year before filing). Naturally, 
Defendant argues that Plaintiff’s injury is the “alleged deprivation of this state-

created property interest” resulting from “a discrete action by the Montgomery 
County District Court on December 20, 2013, when it ordered her license suspended 
for failing to pay her traffic fines and court costs.” (Doc. # 22, at 4–5.) 
 The court agrees that the continuing violations doctrine does not apply to a 
non-Bearden due process claim. Viewed through that constitutional lens, 

Defendant’s wrongful conduct is the initial deprivation of Plaintiff’s property 
interest, allegedly without adequate notice. Therefore, Plaintiff’s claim that 
“[n]either the court nor ALEA gave her notice that her driver’s license could be 
suspended for nonpayment” (Doc. # 1, ¶ 34, at 9) is time-barred.12 See supra Part 

V.A. (explaining why this injury is analyzed separately from Plaintiff’s Bearden 
injuries). 
 But Plaintiff’s Bearden injuries do not constitute a pure procedural due 

process claim. Plaintiff invokes the equal protection aspect of her Bearden claim 
and argues that Defendant’s wrongful conduct is ongoing unequal treatment: “Rule 
26.11 authorizes an indefinite suspension based solely on nonpayment while 

allowing non-indigent drivers to avoid suspension altogether—or to obtain 
immediate reinstatement—by paying their fines and court costs in full.” (Doc. # 21, 
at 19.) 

 12 If, contrary to the court’s conclusion in Part V.A., Plaintiff were required to bring this 
due process claim as a separate count, Plaintiff would not merit leave to amend her complaint 
because this count would be time-barred. “[A] motion for leave to amend may appropriately be 
denied . . . where amendment would be futile.” In re Engle Cases, 767 F.3d 1082, 1108–09 (11th 
Cir. 2014) (quoting Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001)); see also Coventry 
First, LLC v. McCarty, 605 F.3d 865, 870 (11th Cir. 2010) (“A proposed amendment may be 
denied for futility ‘when the complaint as amended would still be properly dismissed.’” (quoting 
Cockrell v. Sparks, 510 F.3d 1307, 1310 (11th Cir. 2007)). 
 If this were any other § 1983 claim arguing procedural due process and equal 
protection theories, the due process claims could be dismissed while the equal 

protection claims remained. That avenue is not available here given the 
interdependent nature of Plaintiff’s Bearden claim. See supra Part V.A. Therefore, 
the timeliness of this case hinges upon whether the statute of limitations turns on the 

dominant features of the injury (a procedural injury) or that any part of the injury is 
a continuing violation. For the reasons below, this claim is not time-barred because 
Plaintiff’s equal protection injury—that she is harmed by an allegedly discriminatory 
program—is essential to her Bearden claim. 

 Based on the dominant injuries suffered and remedy sought, Plaintiff’s 
Bearden claim looks at first glance like a procedural due process claim, akin to 
Walker. The complaint nods to equal protection by alleging that the State is 

“punishing people simply because they are poor” and by stressing the impact of 
suspensions on Alabama’s poor. (Doc. # 1, ¶¶ 1, 10–17, at 1, 3–5.) However, the 
bulk of the complaint alleges quintessential due process injuries, claiming that Rule 
26.11(i)(3) unconstitutionally authorizes and Defendant unconstitutionally 

administers license suspensions without prior notice, without the opportunity to be 
heard, and without an express finding that the motorist can pay but willfully failed 
to do so. (Doc. # 1, ¶¶ 19–22, 29, 30, 34, 39, 43–44, 50, 55–56, 60.) Plaintiff’s 

Bearden claim is so lopsided in this regard that, in the statute of limitations section 
of her brief, her only direct references to her complaint are to her remedy, 
“prospective injunctive relief against Defendant to enjoin the continued suspension 

of her driver’s license,” (Doc. # 21, at 19–20 (emphasis in original)), and to one line 
of her complaint indicating that her driver’s license “remains suspended because she 
is unable to pay her traffic ticket in full,” (Doc. # 21, at 19 (citing Doc. # 1, ¶ 33, at 

9)). 
 Still, Plaintiff’s argument that her procedural injuries result from an ongoing 
discriminatory program cannot be ignored. Plaintiff points to another driver’s 
license suspension case, Robinson v. Purkey, to support her theory. In that case, the 

district court dismissed separately brought procedural due process claims but held 
that the plaintiffs could bring otherwise untimely equal protection claims because 
“the plaintiffs’ injuries include the fact that the state’s scheme currently treats them 

differently from otherwise identical non-indigent drivers, by allowing those drivers 
to have their suspensions lifted by making payments that the plaintiffs cannot make.” 
326 F.R.D. at 145–48. She argues that her Bearden claim is likewise timely because 
a similar discrimination allegation is woven into the hybrid claim. 

 Defendant argues that Robinson is unpersuasive because it analogized the 
plaintiffs’ claimed harm to the harms suffered in a Sixth Circuit substantive due 
process case despite there being no fundamental right to possess a driver’s license. 

(Doc. # 22, at 3–4.) Defendant earns points for paying attention to case details: An 
equal protection claim need not involve an injury to a fundamental right. However, 
both claims can involve allegations of systematic and ongoing deprivations, so 

substantive due process cases can be apt analogies when determining the 
applicability of the continuing violations doctrine. Defendant also alleges that 
Robinson, and by extension Plaintiff’s argument, is unpersuasive because it fails to 

follow Walker’s procedural due process analysis of a Bearden claim. However, 
Walker provides a logical rationale for reconciling this issue. 
 Even though the Eleventh Circuit in Walker recommended using a procedural 
due process analysis to evaluate Mr. Walker’s entitlement to what was essentially 

procedural relief, the panel emphasized that equal protection principles and values 
still underlie any Bearden claim. Walker, 901 F.3d at 1260. Walker, ODonnell I & 
II, and this case involve allegations that additional process may be needed to address 

“an allegation of categorically worse treatment of the indigent.” Id.; ODonnell I, 
892 F.3d at 163; ODonnell II, 900 F.3d at 224; see also Walker, 901 F.3d at 1265 
(“The district court should have applied [a due process] analysis in evaluating 
whether the Standing Bail Order comported with the Constitution’s equal protection 

and due process guarantees.” (emphasis added)); Briggs v. Montgomery, No. CV-
18-02684-PHX-EJM, 2019 WL 2515950, at *22 (D. Ariz. June 18, 2019) (applying 
the continuing violations doctrine to the plaintiffs’ Bearden hybrid claims because 

the plaintiffs alleged that a pretrial diversion program systematically discriminated 
on the basis of wealth). In this light, Plaintiff Motley seeks procedural relief to 
remedy the suspension of her driver’s license that allegedly results from an ongoing 

policy that discriminates against the poor. Because Plaintiff’s discrimination 
allegation is essential and non-severable from the rest of her Bearden claim, that 
claim (and the four injuries related to it) are timely. 

E. Laches 
 Defendant also argues that Plaintiff’s claims are barred by the equitable 
doctrine of laches. To succeed on this defense, Defendant must show 1) “a delay in 
asserting a right or claim,” 2) “that the delay was not excusable,” and 3) “that there 

was undue prejudice to the party against whom the claim is asserted.” Black Warrior 
Riverkeeper, Inc. v. U.S. Army Corps of Eng’rs, 781 F.3d 1271, 1283 (11th Cir. 
2015) (quoting Ecology Ctr. of La., Inc. v. Coleman, 515 F.2d 860, 867 (5th Cir. 

1975)). The effect of Plaintiff’s delay and whether allowing the suit would be 
inequitable to Defendant are generally the focal points of a laches inquiry. 
 [L]aches does not result from a mere lapse of time but from the fact 
 that, during the lapse of time, changed circumstances inequitably work 
 to the disadvantage or prejudice of another if the claim is now to be 
 enforced. By his negligent delay, the plaintiff may have misled the 
 defendant or others into acting on the assumption that the plaintiff has 
 abandoned his claim, or that he acquiesces in the situation, or changed 
 circumstances may make it more difficult to defend against the claim. 

11A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2946 (3d 
ed. 2019) (quoting WILLIAM Q. DE FUNIAK, HANDBOOK OF MODERN EQUITY § 24, at 
41 (2d ed. 1956)); see also Envtl. Def. Fund, Inc. v. Alexander, 614 F.2d 474, 478 
(5th Cir. 1980)13 (“One basic principle has, however, been consistently followed: 

equitable remedies are not available if granting the remedy would be inequitable to 
the defendant because of the plaintiff’s long delay.”). 
 “Whether laches bars an action in a given case depends upon the 

circumstances of that case and is ‘a question primarily addressed to the discretion of 
the trial court.’” Alexander, 614 F.2d at 478 (quoting Gardner v. Panama R. Co., 
342 U.S. 29, 30 (1951)). “Given the fact sensitive nature of a laches inquiry, courts 
have been hesitant to bar claims under a laches defense when there is limited factual 

information available,” such as at the pleading stage. Groucho’s Franchise Sys., 
LLC v. Grouchy’s Deli, Inc., No. 1:14-CV-1725-LMM, 2015 WL 11256661, at *2 
(N.D. Ga. July 1, 2015) (collecting cases). However, “laches may be asserted by 

motion to dismiss for failure to state a claim—provided that the complaint shows 
affirmatively that the claim is barred.” Herron v. Herron, 255 F.2d 589, 593 (5th 
Cir. 1958). 
 Plaintiff claims that laches categorically cannot bar claims for prospective 

injunctive relief. (Doc. # 21, at 20.) This is an unsettled legal question. See Envtl. 
Def. Fund. v. Marsh, 651 F.2d 983, 1005 n.32 (5th Cir. 1981) (“[L]aches may not 

 13 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the 
Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed 
down prior to October 1, 1981. 
be used as a shield for future, independent violations of the law. The concept of 
undue prejudice, an essential element in the defense of laches, is normally 

inapplicable when the relief is prospective.”); Jacobson v. Lee, 411 F. Supp. 3d 
1249, 1264–65 (N.D. Fla. 2019) (“It is not clear whether laches applies at all to 
claims for prospective relief from continuing constitutional violations.” (first citing 

Garza v. Cty. of Los Angeles, 918 F.2d 763, 772 (9th Cir. 1990); then citing Peter 
Letterese & Assocs., Inc. v. World Inst. of Scientology Enters. Int’l, 533 F.3d 1287, 
1321 (11th Cir. 2008); and then citing Democratic Exec. Comm. of Fla. v. Lee, 915 
F.3d 1312, 1326 (11th Cir. 2019))). Plaintiff supports her argument with citation to 

one Eleventh Circuit case, which stated in the copyright infringement context that 
“laches serves as a bar only to the recovery of retrospective damages, not to 
prospective relief.” Peter Letterese & Assocs., Inc. v. World Inst. of Scientology 

Enters. Int’l, 533 F.3d 1287, 1321 (11th Cir. 2008); see also id. at 1321 n.41 
(collecting cases in the copyright context where courts held that laches cannot bar 
injunctions against future intellectual property infringements). It is not clear whether 
this principle applies to constitutional claims. But it need not be determined whether 

Plaintiff’s claimed per se bar exists because Defendant has not made a strong 
showing of prejudice and is therefore unlikely to merit the application of laches to 
Plaintiff’s Bearden claim. 
 Plaintiff has unquestionably delayed in bringing her claims. Her proffered 
reason for the delay, that “[s]he is not trained in the law and had no reason to suspect 

that her driver’s license suspension was unlawful,” (Doc. # 21, at 21), has been 
rejected by the former Fifth Circuit. Akers v. State Marine Lines, Inc., 344 F.2d 217, 
220 (5th Cir. 1965) (“‘[W]e know of no principle which enables persons to plead, 

not excusable ignorance of facts, but of the law which accorded them the right to 
sue.’ Appellant’s mistake as to the law or his unwillingness to press his claim when 
there was authority which indicated he might not prevail, cannot serve to excuse his 
delay . . . .” (quoting Morales v. Moore-McCormack Lines, Inc., 208 F.2d 218, 221 

(5th Cir. 1953))). 
 Read in context, the cases cited by Plaintiff stand for the proposition that a 
“plaintiff’s lack of knowledge” of the facts underlying a possible claim “can serve 

as reason for delay.” Black Warrior Riverkeeper, 781 F.3d at 1284–85 (holding that 
“[t]he district court . . . abused its discretion when it gave no weight to Riverkeeper’s 
need to evaluate, investigate, and prepare its claims for litigation”); Alexander, 614 
F.2d at 479 (“Their claim in effect is reduced to the assertion they did not realize it 

was illegal for the Army to do what it had done. However, the application of laches 
does not depend on subjective awareness of the legal basis on which a claim can be 
made. Moreover, . . . the record contains ample evidence that the problem should 

have been known . . . .”); see also Save Our Wetlands, Inc. v. U.S. Army Corps of 
Eng’rs, 549 F.2d 1021, 1027–28 (5th Cir. 1977) (rejecting the plaintiffs’ claim that 
“their delay in bringing this case is excusable because they were unaware of any 

illegality” surrounding the challenged development on the grounds that they had 
notice of the fact that the challenged development was underway). Because Plaintiff 
knew or should have known of the facts giving rise to her claim sometime between 

December 20, 2013, and July 2, 2017, lack of legal knowledge does not excuse her 
delay. 
 Evaluating claims of prejudice requires balancing the equities, weighing both 
the harm to Defendant, as well as the benefits that might result if Plaintiff is allowed 

to pursue her claim. Black Warrior Riverkeeper, 781 F.3d at 1286. Defendant 
argues it has been prejudiced in three ways: 1) Defendant has expended resources to 
defend against Plaintiff’s suit, 2) the delay in filing suit impairs Defendant’s ability 

to defend himself, and 3) the State changed its traffic tickets before this suit was 
filed to specifically inform drivers that their licenses will be suspended unless they 
request and receive a payment plan from the court. (Doc. # 16, at 16–18.) 
 Defendant’s first argument that it is prejudiced by having to defend Plaintiff’s 

claims at all is specious because it is a harm that Defendant would suffer regardless 
of when Plaintiff filed her lawsuit. As stated in Black Warrior Riverkeeper, “Any 
harm demonstrated by the [Defendant] must stem specifically from [Plaintiff’s] 

delay in bringing suit, rather than from the consequences of an adverse decision on 
the merits . . . .” 781 F.3d at 1286. Defendant’s first argument fails because the 
asserted harm does not stem from Plaintiff’s delay. Likewise, Defendant’s third 

argument that it is prejudiced by the Alabama Supreme Court’s choice to revise the 
State’s traffic tickets is frivolous because that action is not causally connected to 
Plaintiff’s delay, nor was it taken in reliance on Plaintiff’s silence. An argument that 

Defendant should not have to defend against moot claims is a mootness argument, 
not a laches argument. 
 Defendant’s only cognizable argument is that it has been prejudiced by the 
loss of memory and evidence regarding what happened at Plaintiff’s traffic court 

hearing. Specifically, Defendant claims to be prejudiced by the uncertainty 
surrounding whether the Montgomery County District Judge asked Plaintiff about 
her ability to pay her traffic ticket when he imposed her fine. Defendant points to 

Plaintiff’s Declaration, attached to Plaintiff’s motion for class certification, which 
states, “I do not remember the Judge asking me about my finances or whether I could 
pay the ticket.” (Doc. # 5-1, ¶ 3, at 1.) It need not be decided whether Plaintiff’s 
declaration or the other evidence cited by Defendant can be considered for purposes 

of this 12(b)(6) motion. (See Doc. # 16, at 17 (claiming that “[t]he Montgomery 
County District Judge’s order indicates on its face that he did make a determination 
that Plaintiff could pay by November 19, 2013, or at least that she should reappear 

in court on that date to explain why she could not” (emphasis in original))); see also 
supra note 11 (addressing Plaintiff’s objection to Defendant’s characterization of the 
Montgomery County District Judge’s order). Even if this evidence were considered, 

Defendant’s argument is unavailing because of the nature of Plaintiff’s Bearden 
claim. Plaintiff claims that Defendant’s enforcement of Rule 26.11(i)(3) violated 
her Fourteenth Amendment rights and injured her through Defendant’s failure to 

give her notice “that her ability to pay is a critical issue in determining the 
appropriateness of suspension” and to offer “an ability to pay hearing” after she 
defaulted but before her license was suspended. (Doc. # 1, ¶ 34, at 9; Doc. # 21, at 
22.) She argues that Rule 26.11(i)(3) is facially unconstitutional because it 

authorizes suspensions without requiring the State to provide these protections. 
What happened at Plaintiff’s fine-imposition hearing is largely irrelevant to 
Plaintiff’s Bearden claim because she undisputedly did not receive the process she 

believes she is due. 
 Simply put, Defendant’s prejudice arguments are dissimilar to cases where 
government actors have successfully asserted a laches defense. Defendant has not 
begun construction on some public works project. Alexander, 614 F.2d at 480. The 

State is not printing ballots for an election while battling allegations that additional 
candidates should be on it, Perry v. Judd, 471 F. App’x 219, 223, 227 (4th Cir. 2012), 
or facing the prospect of drawing new electoral districts twice in two years, Chestnut 

v. Merrill, 377 F. Supp. 3d 1308, 1317 (N.D. Ala. 2019); see also Sanders v. Dooly 
Cty., 245 F.3d 1289, 1290–91 (11th Cir. 2001) (per curiam) (affirming a district 
court’s application of laches in part because “redistricting late in the decade would 

lead to back-to-back redistrictings”). “In [this] case, however, the Secretary has not 
alleged, let alone provided evidence of, some substantial administrative or logistical 
difficulties, confusion, disorganization, or expense which would be caused if the 

court allowed the [P]laintiff[] to press these admittedly delayed constitutional 
claims.” Mich. Chamber of Commerce v. Land, 725 F. Supp. 2d 665, 682 (W.D. 
Mich. 2010) (involving an as-applied challenge to the Michigan Secretary of State’s 
interpretation of the Michigan Campaign Finance Act). In fact, if Plaintiff’s suit is 

meritorious, Plaintiff’s delay has saved Defendant from expending State resources 
on additional notices and hearings over the last six years. 
 Despite Defendant’s attempts to shift focus onto the notice and hearing given 

before imposition of a traffic fine (as Defendant does throughout its briefing), 
Plaintiff’s Bearden claim centers on Alabamians’ alleged rights to notice and a 
hearing in the time between default and suspension. There is no dispute that Plaintiff 
was not afforded such process and that Rule 26.11(i)(3) does not require it. 

Ultimately, Defendant has made a weak showing of prejudice, which is fatal to its 
claim for laches. Plaintiff’s laches argument did not mention any benefits to weigh 
against Defendant’s prejudice, but even if Plaintiff only stood to gain a negligible 
improvement in her quality of life, such benefits would outweigh Defendant’s 
claimed inequity. 

 Defendant must also show that its stated grounds for prejudice apply to 
Plaintiff’s claim for declaratory relief, which is a heavier lift. Sanders, 245 F.3d at 
1291 (“None of the grounds for prejudice that the district court relied on applies to 

the plaintiffs’ claims for a declaration that the 1992 plan violates the Equal 
Protection Clause.”); Navarro v. Neal, 716 F.3d 425, 429–30 (7th Cir. 2013) 
(allowing a claim for declaratory relief to proceed because the court failed to see 
“how the plaintiffs’ delay in filing suit could impact a purely prospective remedy”). 

But see City of Sherrill v. Oneida Indian Nation of N.Y., 544 U.S. 197 (2005) 
(applying laches to bar an Indian tribe’s claims for declaratory and injunctive relief 
recognizing its sovereignty over parts of central New York). The rationale employed 

to permit Plaintiff’s Bearden claim for injunctive relief applies with equal, if not 
greater, force to Plaintiff’s Bearden claim for declaratory relief, so that claim is not 
barred by laches. 
 Defendant has not made a specific argument that Plaintiff’s non-Bearden 

procedural due process claim is barred by laches. Unlike Plaintiff’s Bearden claim, 
Plaintiff’s claim that she was not notified that her license could be suspended for 
nonpayment could depend on the facts of what she was told by, for example, the 

officer who wrote her traffic ticket or the judge who imposed her fine. The memories 
of these, and other witnesses, may have faded. (There is no dispute that Rule 
26.11(i)(3) does not require the State to give individual notice of this possibility.) 

However, Defendant has not argued this exact point, and prejudice to Defendant is 
not evident from Plaintiff’s complaint or filings. While Defendant has made a 
general objection that “memories are fuzzy,” (Doc. # 22, at 7), its only evidence of 

stale memories is Plaintiff’s statement that she does not remember if the judge at her 
fine-imposition hearing asked about her ability to pay. Defendant’s arguments do 
not call into question Plaintiff’s allegation that “[n]either the court nor ALEA gave 
her notice that her driver’s license could be suspended for nonpayment.” (Doc. # 1, 

¶ 34, at 9.) Although, if Plaintiff bears the burden of showing “either absence of 
prejudice or an excuse for delay” on this claim, she would likely fail to meet her 
burden. See Coffey v. Braddy, 834 F.3d 1184, 1192 (11th Cir. 2016) (“When a claim 

is filed within the analogous statutory period, the burden is on the defendant to show 
that it was prejudiced by the plaintiff’s inexcusable delay; when the claim is filed 
outside of the statutory period, the plaintiff must show either absence of prejudice 
or an excuse for delay.”) This issue need not be decided because it has not been 

fully briefed and because the statute of limitations bars this procedural due process 
claim. 
F. The Merits 
 1. Equal Protection 

 Recent Bearden cases such as Walker and ODonnell I have taken for granted 
that a plaintiff could prevail by successfully arguing either an equal protection or a 
due process theory. The courts deciding these cases could choose to employ either 

rubric because previous cases had already established that a government must have 
some concern for the burdens placed upon indigent people in the contexts of pre-
trial detention. However, this case is an exception because Griffin/Bearden’s 
principle of “equal justice” for indigent people has not been extended to the context 

of driver’s license suspensions. 
 Therefore, before it can be determined whether the State was constitutionally 
required to give Plaintiff notice “that her ability to pay is a critical issue in 

determining the appropriateness of suspension,” to provide her “an ability to pay 
hearing prior to the suspension,” and/or to make an express finding that she willfully 
failed to pay, (Doc. # 1, at 9), Plaintiff must first state a plausible claim that Rule 
26.11(i)(3) is facially unconstitutional because it authorizes suspensions without 

requiring the State to consider her ability to pay. Plaintiff has not argued a 
substantive due process theory, nor would she likely succeed on such a claim in this 
Circuit. See McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) 

(“[A]reas in which substantive rights are created only by state law (as is the case 
with tort law and employment law) are not subject to substantive due process 
protection . . . .”); Burlison v. Rogers, 311 F. App’x 207, 208 (11th Cir. 2008) (per 

curiam) (“When the right at stake—here, possession of a driver’s license—is a right 
created only by state law, it is not a right that gives rise to substantive due process 
protection under the Due Process Clause.” (citing McKinney, 20 F.3d at 1555–56)). 

Therefore, the right to an indigency exception must arise under the Equal Protection 
Clause. This case is more analogous to Jones than Walker because it must be 
determined whether Bearden’s principles extend to this context. Accordingly, the 
court will follow the analytical steps laid out in Jones, with an added intermediate 

step from Walker, regarding whether and how to apply heightened scrutiny to a 
purported Bearden claim. 
 a. Heightened Scrutiny 

 The Jones panel provided a two-step instruction manual on how to determine 
the applicability and effect of heightened scrutiny. First, determine if this type of 
case falls within one of the “discrete areas” where “the Supreme Court has told us 
that wealth classifications require more searching review.” Jones, 950 F.3d at 817. 

Second, if this case is subject to more searching review, analyze whether Bearden’s 
four factors counsel in favor of a determination that the challenged Rule is 
unconstitutional. Id. at 825. Walker adds an additional necessary condition after 
Jones’s first step: determine if the policy produces an absolute deprivation or a mere 
diminishment of Plaintiff’s interest. 

 i. Jones Step 1 
 “Where a law draws suspect classifications or burdens fundamental rights, we 
look beyond the benign glance of rational basis review and demand a tighter fit 

between the classification and the government’s interests.” Jones, 950 F.3d at 817. 
This case does not fit into either category because “wealth is not a suspect 
classification,” Jones, 950 F.3d at 817, and a driver’s license is not a fundamental 
right. McKinney, 20 F.3d at 1556; Burlison, 311 F. App’x at 208. Therefore, the 

Rule only merits heightened scrutiny if it falls into an “exception[] to that general 
rule,” M.L.B., 519 U.S. at 124, “that fee requirements ordinarily are examined only 
for rationality.” Id. at 123; see also Romer v. Evans, 517 U.S. 620, 631 (1996) (“[I]f 

a law neither burdens a fundamental right nor targets a suspect class, we will uphold 
the legislative classification so long as it bears a rational relation to some legitimate 
end.”); Jones, 950 F.3d. at 817 (citing M.L.B., 519 U.S. at 123). 
 So far, four categories of cases have fallen into this exception. Bearden’s 

exception applies to wealth discrimination that affects the administration of criminal 
justice, particularly by imprisoning or punishing14 indigents for their inability to 

 14 The Jones panel interpreted the Bearden-Tate-Williams line of cases to stand for the 
proposition that “[t]he Supreme Court has also determined that a state may not extend punishment 
satisfy some financial burden. See Bearden, 461 U.S. 660; Tate v. Short, 401 U.S. 
395, 399 (1971) (“Since Texas has legislated a ‘fines only’ policy for traffic offenses, 

that statutory ceiling cannot, consistently with the Equal Protection Clause, limit the 
punishment to payment of the fine if one is able to pay it, yet convert the fine into a 
prison term for an indigent defendant without the means to pay his fine.”); Williams 

v. Illinois, 399 U.S. 235, 240–41 (1970) (holding that Illinois’s practice of extending 
a prisoner’s sentence beyond the maximum authorized by the statute of conviction 
because of a prisoner’s “involuntary nonpayment of a fine or court costs” is “an 
impermissible discrimination that rests on ability to pay”); Jones, 950 F.3d at 820 

(holding that heightened scrutiny is warranted where the state “demanded that 
punishment continue for some and not others based on wealth” and doubly so “where 
the punishment itself takes the form of denying access to the franchise”); Walker, 

901 F.3d 1245. 
 Griffin’s exception applies to policies, such as filing and transcript fees, that 
restrict access to courts in criminal cases and in civil habeas actions. See, e.g., Mayer 
v. Chicago, 404 U.S. 189 (1971) (applying Griffin to overturn Chicago’s practice of 

only providing free transcripts for appeals in felony cases); Smith v. Bennett, 365 
U.S. 708, 713 (1961) (holding that states must “docket applications for the post-

on account of inability to pay fines or fees.” Jones, 950 F.3d at 818 (emphasis added). This 
holding is surprising considering that the most readily apparent commonality among the Bearden 
line of cases is imprisonment. Still, this new interpretation is binding. 
conviction remedy of habeas corpus by indigent prisoners without [a] fee payment”); 
Griffin, 351 U.S. 12 (holding that the “guarantees of due process and equal 

protection” forbid states from conditioning a criminal defendant’s right to appeal on 
the appellant’s ability to afford a transcript). 
 Griffin’s exception has also been extended to provide access to courts in civil 

cases involving state controls or intrusions on fundamental family relationships. See 
M.L.B., 519 U.S. at 116, 128 (holding that states cannot condition the right to appeal 
a decision permanently terminating parental rights on the terminated parent’s ability 
to afford a transcript); Little v. Streater, 452 U.S. 1, 13–17 (1981) (holding that states 

must pay for blood grouping tests sought by an indigent defendant to enable him to 
contest a paternity suit); Zablocki v. Redhail, 434 U.S. 374 (1978) (striking down a 
statute that required an individual to show that he had satisfied court-ordered child 

support before being able to marry); Boddie v. Connecticut, 401 U.S. 371 (1971) 
(holding that states cannot deny divorce to indigent couples for failing to pay court 
costs). 
 The fourth exception has applied to restrictions on the right to participate in 

political processes as voters and candidates. See, e.g., Lubin v. Panish, 415 U.S. 
709, 710, 718 (1974) (invalidating a California statute requiring payment of a ballot-
access fee fixed at a percentage of the salary for the office sought); id. at 719–20 

(Douglas, J., concurring) (invoking Griffin in support of the Court’s holding); 
Bullock v. Carter, 405 U.S. 134, 135, 145, 149 (1972) (invalidating a Texas scheme 
under which candidates for local office had to pay fees as high as $8,900 to get on 

the ballot); Harper v. Virginia Bd. of Elections, 383 U.S. 663, 664, 666 (1966) 
(invalidating, as a denial of equal protection, an annual $1.50 poll tax imposed by 
Virginia on all residents over the age of 21); Jones, 950 F.3d at 823 (“[O]nce a state 

provides an avenue to ending the punishment of disenfranchisement—as the voters 
of Florida plainly did—it must do so consonant with the principles of equal 
protection and it may not erect a wealth barrier absent a justification sufficient to 
overcome heightened scrutiny.”); see also id. at 825 (“Quite simply, two strands of 

Supreme Court law—those embodied in its Griffin–Bearden line of cases outlawing 
different levels of punishment for similarly situated defendants, solely on account of 
wealth, and those found in the Harper line of cases underscoring the importance of 

access to the ballot—run together in this case. These weighty interests are directly 
implicated[,] and they yield the conclusion that we must examine the Amendment’s 
impact on the seventeen named plaintiffs through the lens of heightened scrutiny.”). 
 Despite Plaintiff’s arguments to the contrary, these four categories are 

currently the only exceptions meriting heightened scrutiny, and neither the Supreme 
Court nor the Eleventh Circuit is engaged in a steady course of adding to this list. 
See Jones, 950 F.3d at 817–21. In the Griffin access-to-courts line of cases, the 

Court has rejected exceptions involving interests that are at least as important to 
individuals as Plaintiff’s interest in her license, including one’s interest in filing for 
bankruptcy or in appealing welfare determinations. See, e.g., Ortwein v. Schwab, 

410 U.S. 656, 659 (1973) (per curiam) (“In Kras, we observed that one’s interest in 
a bankruptcy discharge ‘does not rise to the same constitutional level’ as one’s 
inability to dissolve his marriage except through the courts. 409 U.S. at 445. In this 

case, appellants seek increased welfare payments. This interest, like that of Kras, 
has far less constitutional significance than the interest of the Boddie appellants.”); 
United States v. Kras, 409 U.S. 434, 445 (1973). 
 This case comes closest to falling in the Bearden line of cases. Plaintiff was 

charged in her 2013 ticket with driving with a suspended license,15 a misdemeanor 
offense. Ala. Code § 32-6-19(a)(1); (see Doc. # 7-21, at 2.) The Eleventh Circuit 
has interpreted Griffin and Bearden to stand for the proposition that “heightened 

scrutiny is triggered when the State alleviates punishment for some, but mandates 
that it continue for others, based solely on account of wealth.” Jones, 950 F.3d at 

 15 The court takes judicial notice of the fact that Ms. Motley’s ticket accused her of driving 
with a suspended license in violation of Ala. Code § 32-6-19. This fact is contained in the citation 
record for Plaintiff’s June 18, 2013 ticket. It is not reasonably subject to dispute because both 
Plaintiff and Defendant acknowledge this fact in their briefing. (Doc. # 21, at 7 (citing Doc. # 7-
21, at 2); Doc. # 16, at 7 (citing Doc. # 14-1, at 7, which is likewise a copy of the citation record).) 
It can accurately and readily be determined from an official public record of Plaintiff’s ticket (a 
charging document in state court litigation), whose accuracy cannot reasonably be questioned. 
Fed. R. Evid. 201(b); Osheroff, 776 F.3d at 811–12 & n.4. Alternatively, the court may consider 
this extrinsic document (Doc. # 7-21, at 2) because it is “(1) central to the plaintiff’s claim, and (2) 
its authenticity is not challenged.” SFM Holdings, Ltd., 600 F.3d at 1337; see also Harris, 182 
F.3d at 802 n.2. 
819. However, Defendant correctly argues that “the suspension of Plaintiff’s license 
is not the continuation of a punishment imposed at criminal sentencing” because 

Plaintiff’s punishment was the imposition of a fine after being convicted of a traffic 
offense. (Doc. # 29, at 2; Doc. # 1, ¶ 33, at 9.) The State is not currently punishing 
Plaintiff for the traffic offense; it is depriving her “of a property interest—such as a 

driver’s license—because of [her] inability to pay a fine associated with that 
interest.” Fowler v. Johnson, No. CV 17-11441, 2017 WL 6379676, at *7 (E.D. 
Mich. Dec. 14, 2017), rev’d and remanded on other grounds sub nom. Fowler v. 
Benson, 924 F.3d 247 (6th Cir. 2019). Plaintiff is, therefore, in a different situation 

from the Jones plaintiffs, whose original criminal sentences included the punishment 
of disenfranchisement. See Jones, 950 F.3d. at 819–20. 
 Plaintiff has taken two somewhat contradictory positions on the question of 

what type of sanction is at issue. She chiefly argues that Jones and Bearden govern 
this case, implying that her license suspension is a criminal punishment, but she also 
suggests that suspension under Rule 26.11(i)(3) is a form of civil contempt and is 
governed by Turner v. Rogers, 564 U.S. 431 (2011). (Compare Doc. # 28 (arguing 

that Jones is relevant authority), and Doc. # 21, at 9–17, with Doc. # 21, at 13; see 
also Doc. # 21, at 10 n.5 (arguing that because licensees must pay their fines in full 
to have their licenses reinstated, their suspensions “cannot be equated with the 

alternatives a court may impose ‘in lieu of a fine’ like the payment plans or 
community service identified in Bearden”).) Plaintiff has attempted to explain away 
this contradiction by arguing that Turner expands Bearden to the civil contempt 

context, but a closer evaluation suggests that these are separate lines of precedent.16 
 Turner is, first and foremost, a right-to-counsel case. Mr. Turner had been 
imprisoned through a civil contempt proceeding for failing to pay child support. 

Turner, 564 U.S. at 436. The central question was “whether the Due Process Clause 
grants an indigent defendant, such as Turner, a right to state-appointed counsel at a 
civil contempt proceeding, which may lead to his incarceration.” Id. at 441. The 
Court held that there was no automatic right to counsel so long as “the opposing 

parent or other custodian (to whom support funds are owed) is not represented by 
counsel and the State provides alternative procedural safeguards equivalent to” the 
following: 

 (1) notice to the defendant that his ‘ability to pay’ is a critical issue in 
 the contempt proceeding; (2) the use of a form (or the equivalent) to 
 elicit relevant financial information; (3) an opportunity at the hearing 
 for the defendant to respond to statements and questions about his 
 financial status (e.g., those triggered by his responses on the form); and 
 (4) an express finding by the court that the defendant has the ability to 
 pay. 

Id. at 447–48. 

 16 This finding would stand even if the court considered Plaintiff’s expanded discussion 
of this issue in her brief in support of her motion for a preliminary injunction. (Doc. # 4, at 20–
21, 22, 24–25, 30 n.21.) 
 In order to explain how civil contempt differs from criminal contempt (where 
the defendants have a Sixth Amendment right to counsel), the Court quoted Hicks v. 

Feiock, 485 U.S. 624, 638 n.9 (1988), for the principle that “[a] court may not impose 
punishment ‘in a civil contempt proceeding when it is clearly established that the 
alleged contemnor is unable to comply with the terms of the order.’” Id. at 442. 

Plaintiff argues that this principle applies to her case. Examination of the cases cited 
in Hicks in support of this principle reveals that this line of cases dates back to the 
tenure of Chief Justice Taft and, more importantly, that the Hicks principle is not 
grounded in equal protection doctrine. See Hicks, 485 U.S. at 638 n.9; United States 

v. Rylander, 460 U.S. 752, 757 (1983); Shillitani v. United States, 384 U.S. 364, 371 
(1966); Oriel v. Russell, 278 U.S. 358, 366 (1929) (quoting In re Epstein, 206 F. 
568, 570 (E.D. Pa. 1913)). Mr. Turner’s ability to pay (one of many possible forms 

of inability to comply) was a critical issue in his civil contempt proceeding under 
state law and under this broader principle, not under the Equal Protection Clause. 
See 564 U.S. at 436, 442. 
 Despite Turner’s “ability-to-pay” language, it is not clear that Turner is an 

extension of Bearden; Turner appears to only define an alleged civil contemnor’s 
due process rights. Plaintiff’s underdeveloped civil contempt theory may, for a 
future plaintiff, be a more apt vehicle for attacking Rule 26.11(i)(3), as the Rule does 
appear to create some form of civil penalty. But because this appears to be a due 
process theory, Plaintiff’s attempt to argue it is untimely. See supra Part V.D. 

 Returning to the Jones equal protection analysis, Jones notes that Griffin’s 
equality principle (and, accordingly, heightened scrutiny) “has been applied to state 
action that burdens important constitutional interests, such as fundamental 

associational and political participation interests.” Jones, 950 F.3d at 820. The 
continued possession of a driver’s license is unquestionably an important interest for 
most Alabamians. Plaintiff’s suspended license impairs her ability to secure and 
retain employment, apply for housing, cash checks, and access medical care. (Doc. 

# 1, ¶¶ 35–36, at 9.) But the continued possession of a driver’s license is not an 
“important constitutional interest” on the same plane as imprisonment and criminal 
punishment, disenfranchisement, the inability to access criminal judicial processes, 

or the deprivation of family rights. Applying heightened scrutiny to Rule 26.11(i)(3) 
is not warranted. 
 ii. Walker’s “Absolute Deprivation” Test (Jones Step 1.5) 
 Notably, the parties’ heightened scrutiny arguments did not focus on context 

and instead focused on Walker’s discussion of a line of dicta in San Antonio 
Independent School District v. Rodriguez, 411 U.S. 1 (1973). Walker’s summary of 
Rodriguez suggests a different test for when heightened scrutiny applies to a wealth 

discrimination claim: 
 Analyzing prior cases, with a focus on Bearden’s antecedents, the 
 [Supreme] Court concluded that instances where wealth-based 
 distinctions were impermissible “shared two distinguishing 
 characteristics: because of their impecunity[, indigent persons] were 
 completely unable to pay for some desired benefit, and as a 
 consequence, they sustained an absolute deprivation of a meaningful 
 opportunity to enjoy that benefit.” 

Walker, 901 F.3d at 1261 (quoting Rodriguez, 411 U.S. at 20). 
 Rodriguez involved a challenge to Texas’s system of funding primary and 
secondary education in part through local property taxes, which resulted in wealth-
based disparities in local education budgets. Rodriguez, 411 U.S. at 15–16. 
Rodriguez’s reference to an “absolute deprivation” introduced a discussion of cases, 
including Griffin, Douglas v. California (372 U.S. 353 (1963)), Williams, Tate, and 
Bullock, where indigent individuals were absolutely deprived of their rights to access 
court processes in criminal trials and appeals, to have appointed counsel on direct 
appeal in a criminal case, to not be imprisoned for failure to pay a fine, and to run 
for elected office. Id. at 21–22. The Court in Rodriguez held that there was no 
suspect classification at issue. Id. at 28. The Court was also skeptical of the idea 
that a fundamental constitutional right to an education existed, but avoided deciding 

that issue because the disparate budgets represented a diminishment, not an absolute 
deprivation, of the alleged “right” to an education. Id. at 36–37 (“Even if it were 
conceded that some identifiable quantum of education is a constitutionally protected 

prerequisite to the meaningful exercise of either right, we have no indication that the 
present levels of educational expenditures in Texas provide an education that falls 
short. Whatever merit appellees’ argument might have if a State’s financing system 

occasioned an absolute denial of educational opportunities to any of its children, that 
argument provides no basis for finding an interference with fundamental rights 
where only relative differences in spending levels are involved . . . .”). 

 Walker does not clearly explain that the Rodriguez “test” is a necessary but 
not a sufficient condition for heightened scrutiny in a wealth discrimination case. 
The Jones panel made no mention of this section of Rodriguez or of Walker’s 
emphasis on it, despite citing both cases. The logical explanation for this seeming 

disconnect is that there are two necessary conditions that must be satisfied before a 
wealth discrimination claim merits heightened scrutiny. Each case focused on the 
necessary condition that was in doubt while omitting discussion of the necessary 

condition that was obviously satisfied. Walker turned upon the distinction between 
absolute and relative deprivation because the constitutional interest at issue had 
previously been recognized in Pugh v. Rainwater, 572 F.2d 1053, 1056 (5th Cir. 
1978). Jones turned upon whether the “desired benefit” was constitutionally 

important enough to merit an exception, because the plaintiffs had unquestionably 
suffered an absolute deprivation of their rights to vote. 
 Walker’s absolute deprivation test functions as a Jones Step 1.5. Defendant 

argues that Ms. Motley and other individuals with similar suspensions are not 
absolutely deprived of their licenses because it is possible that they may obtain and 
complete payment plans. But this assertion runs afoul of the Rodriguez Court’s 

statement that Williams involved an absolute deprivation. The appellant in that case 
was incarcerated to work off his monetary obligations at a rate of $5 per day. 
Williams, 399 U.S. at 236. Because of this system, Mr. Williams was more likely to 

eventually “pay” his debt and receive his “desired benefit” than Ms. Motley, whose 
future ability to pay cannot be certain. Because Plaintiff has no certain end date to 
her deprivation, this case cannot be analogous to Walker, where the indigent person 
was guaranteed an opportunity to argue for his or her “desired benefit” of relief on 

a recognizance bond within forty-eight hours after detention. If Mr. Williams was 
absolutely deprived, so is Ms. Motley, and Walker’s necessary condition is satisfied. 
But because her desired benefit is not an important constitutional interest, 

proceeding to Jones’s second step, analyzing the Rule along Bearden’s four factors, 
is inappropriate. Instead, the proper approach is to determine whether the Rule 
survives rational basis review. 
 b. Rational Basis Review 

 Under rational basis review,17 a law must be rationally related to a legitimate 
governmental interest, and it “must be upheld against equal protection challenge if 

 17 In Jones, the Eleventh Circuit conducted two rational basis analyses: one analyzing the 
challenged rule as applied to the plaintiffs at bar who were genuinely unable to pay and one 
there is any reasonably conceivable state of facts that could provide a rational basis 
for the classification” between persons. F.C.C. v. Beach Commc’ns, Inc., 508 U.S. 

307, 313 (1993). While not “toothless,” rational basis review is highly deferential 
to governmental action. Schweiker v. Wilson, 450 U.S. 221, 234 (1981) (quoting 
Mathews v. Lucas, 427 U.S. 495, 510 (1976)). When reviewing a statute for 

rationality, a court must ask “whether there is any rational basis for the law, even if 
the government’s proffered explanation is irrational, and even if it fails to offer any 
explanation at all.” Jones, 950 F.3d at 809. “[T]he varying treatment of different 
groups or persons” must be “so unrelated to the achievement of any combination of 

legitimate purposes that [one] can only conclude that the legislature’s actions were 
irrational.” Vance v. Bradley, 440 U.S. 93, 97 (1979). 
 “The question [to] ask is whether the legislature could have conceived of a 

rational basis for the classification it drew.” Jones, 950 F.3d at 809. “[A] legislative 
choice is not subject to courtroom factfinding and may be based on rational 
speculation unsupported by evidence or empirical data.” Beach Commc’ns, Inc., 

analyzing the challenged rule as applied to the whole class of felons whom it affected. The court 
found that the law failed rational basis review with respect to the former group because 
disenfranchisement did not increase the likelihood of repayment. However, the court found that 
the law passed rational basis review with regard to the latter group because those plaintiffs had not 
shown that the class as a whole had similar financial constraints. Jones, 950 F.3d at 809–17. This 
portion of the court’s opinion is not binding because the panel found that heightened scrutiny 
applied, and it invalidated the challenged law on that basis. Id. at 817–28. The Jones analysis is 
additionally distinguishable because Ms. Motley has disclaimed all right to bring an as-applied 
challenge and is only bringing a facial challenge to this Rule. (Doc. # 21, at 22–24.) Therefore, 
one broad rational basis analysis has been conducted in this case. 
508 U.S. at 315. Plaintiff must show that the facts do not support the classification 
and that “the legislative facts on which the classification is apparently based could 

not reasonably be conceived to be true by the governmental decisionmaker.” 
Bradley, 440 U.S. at 110–11. 
 As the party challenging the lawfulness of the legislative classification, 

Plaintiff bears the burden of making a plausible showing of irrationality. Statutes 
that do not draw lines based on suspect classes or burden fundamental rights bear “a 
strong presumption of validity, and those attacking the rationality of the legislative 
classification have the burden ‘to negative every conceivable basis which might 

support it.’” Beach Commc’ns, Inc., 508 U.S. at 314–15 (quoting Lehnhausen v. 
Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)) (internal citation omitted). 
 Defendant has offered the following justification for the State’s wealth-based 

classification: 
 This rule is rationally related to the government’s legitimate purpose in 
 enforcing the collection of fines, restitution, and court costs incurred 
 with traffic tickets issued for traffic infractions. This, of course, is 
 related to the State’s larger purpose in protecting public safety 
 th[r]ough enforcing the rules of the road. The sanction of the 
 suspension of a driver[’s] license for failure to pay traffic tickets is a 
 powerful incentive for a motorist to pay fines and costs incurred in a 
 traffic offense. 
(Doc. # 16, at 26.) 
 Defendant also argues that the harsh consequences of the Rule are mitigated 
somewhat when “read in conjunction with Rule 26.11(a) and (d)” which, in 
Defendant’s view,18 “expressly require courts to consider a defendant’s financial 
resources and to determine whether a defendant should be allowed to pay a monetary 

fine in installments and what length of time should be allowed for payment.” (Doc. 
# 16, at 26); see Ala. R. Crim. P. 26.11(a) (“The financial resources and obligations 
of the defendant and the burden that payment of restitution will impose should be 

considered in determining how much restitution is to be paid or collected, i.e., 
whether to be paid by installments and what length of time should be given for 
payment.”); Ala. R. Crim. P. 26.11(d) (“If the defendant cannot pay the costs, fine, 
and/or restitution immediately after pronouncement of the sentence as preferred, the 

court may permit payment of the costs, fine, and/or restitution, at some later date, or 
in specified installments.”); see also Ala. R. Crim. P. 26.11(b), 26.11(b)(2)–(3) 
(“[I]n determining whether to impose a fine, the court should consider: . . . (2) The 

financial resources and obligations of the defendant and the burden that payment of 
a fine will impose; [and] (3) The ability of the defendant to pay a fine forthwith on 
an installment basis or on other conditions to be fixed by the court . . . .”). Defendant 
argues that “[t]hese rules of procedure adequately balance the State’s interest in 

 18 See supra note 4 and accompanying text (finding that “[t]he words should and may, 
when read in their ordinary sense, mean that courts are not required to consider the indigency of 
the defendant in deciding whether to impose a fine or in determining why a fine has not been 
paid”). 
enforcing traffic fines with fairness to indigent defendants and thus satisfy rational 
basis review.” (Doc. # 16, at 26.) 

 Plaintiff responds that the Rule lacks a rational basis because “‘there is no 
empirical evidence suggesting that people comply with requirements because their 
driving privilege was suspended’—let alone that such license suspension policies 

result in increased collections from indigent persons.” (Doc. # 21, at 12 (emphasis 
in original) (quoting Doc. # 7-17, at 16).) She also argues that research supports the 
view that license suspensions for non-compliance with court requirements detract 
from public safety and lack rehabilitative or deterrent value. (Doc. # 21, at 12–13 

(first citing Doc. # 7-17 at 9, 16, 19–20 and then citing Doc. # 7-18, at 9).)19 
 Rational basis review can include consideration of possible explanations not 
offered by the State. Beach Commc’ns, Inc., 508 U.S. at 315; Jones, 950 F.3d at 

809. In their appellate brief in Mendoza v. Strickler, the officials representing the 
Oregon State government offered a persuasive rationale for why this type of policy 
is rational even when applied to indigent persons. “Where a state’s primary means 

 19 It need not be decided whether the extrinsic documents Plaintiff cites can be considered 
at the 12(b)(6) stage, because even with their consideration, Plaintiff would not prevail on this 
issue. Plaintiff’s pincites have been adjusted to reflect the CM/ECF page numbers. 
 This finding would stand even if the court considered Plaintiff’s expanded discussion of 
this issue in her brief in support of her motion for a preliminary injunction. (Doc. # 4, at 29–31 
(arguing that the Rule is irrational because suspending licenses for nonpayment hurts suspended 
persons’ employment prospects and, thus, their abilities to repay their fines and arguing that people 
who are too poor to pay cannot be coerced into paying money that they do not have and cannot 
obtain).) 
of ensuring compliance with traffic laws is financial penalties, a driver who has no 
means of paying those penalties—that is, someone who has no wages to garnish, no 

tax refunds to offset, and no ability to obtain credit regardless of outstanding traffic 
debts—suffers little practical consequence for violating traffic laws. For such 
drivers, one reasonable way to deter violations is a non-financial penalty such as 

license suspension.” Brief for Appellees, Mendoza v. Strickler, No. 19-35506, 2019 
WL 6351532, at *35–36 (9th Cir. Nov. 20, 2019) (internal citation omitted). 
 As far as this court is aware, all but one federal court to consider this question 
has found that such policies pass rational basis review. Courts have generally 

reached this conclusion because, even assuming that these practices are not good 
policy, “[m]isguided laws may nonetheless be constitutional.” Fowler, 924 F.3d at 
263 (quoting James v. Strange, 407 U.S. 128, 133–34 (1972)), aff’g on this ground, 

rev’g on other grounds sub nom. Fowler v. Johnson, No. CV 17-11441, 2017 WL 
6379676 (E.D. Mich. Dec. 14, 2017); see also id. at 262–63 (“By imposing greater 
consequences for violating traffic laws, the state increases deterrence for would-be 
violators. The state also has legitimate interests in promoting compliance with court 

orders and in collecting traffic debt. . . . Michigan’s choice to wield the cudgel of 
driver’s-license suspension for nonpayment of court debt dramatically heightens the 
incentive to pay. Such a policy is rationally related to ‘the government’s interest in 

prompt assessment and collection of civil penalties.’” (quoting Blackhawk Mining 
Co. v. Andrus, 711 F.2d 753, 757 (6th Cir. 1983))); Johnson, 381 F. Supp. 3d at 631 
(“Revocation of driver’s licenses for failure to pay traffic violation fines or costs 

serves . . . to impos[e] a motivation to accomplish what an individual might 
otherwise be disinclined to do — here, to pay the fines and costs properly imposed 
on traffic defendants.” (alteration in original) (citation and internal quotation marks 

omitted)); Mendoza v. Garrett, 358 F. Supp. 3d 1145, 1174–75 (D. Or. 2018) 
(“Fines, therefore, are rationally related to enforcement of traffic laws and to the 
deterrence of continued violations. The sting of paying a fine will hopefully prevent 
future unsafe driving practices. Even those who can pay the fine likely do not desire 

to part with their money for this reason. Methods by which the state can enforce 
compliance with the fine requirement, therefore, are rationally related to the safety 
goal. Without a compliance mechanism, the fine is toothless and without deterrent 

effect. Accordingly, fines are reduced to a judgment, subject to payment or 
collection by a number of methods, and eventually or additionally, can result in the 
violator’s license suspension if the fine is unpaid.”). But see Robinson, 326 F.R.D. 
at 154–59, abrogated by Fowler, 924 F.3d at 263. 

 The reasoning of those cases is persuasive. Even assuming it is not, the 
Eleventh Circuit has likewise held that a government policy can survive rational 
basis review even when it “may not be the best method—or may even be a poor 

one—for achieving [the government’s] goal,” so long as “it is still rational to think 
that the challenged [policy] would advance the government’s stated purpose.” Cook 
v. Bennett, 792 F.3d 1294, 1301 (11th Cir. 2015) (reaching the same result under due 

process rational basis review and under the “essentially equivalent” standards of 
equal protection rational basis review). While license suspension for nonpayment 
of traffic fines may not be the best way (and may even be a poor way) to accomplish 

the state’s goals, the challenged Rule is facially constitutional because it is rationally 
related to the State’s legitimate interests in collecting fines, protecting public safety, 
and deterring traffic violations, even if it visits harsher consequences on indigent 
persons. Plaintiff has not made a plausible showing that “the legislative facts on 

which the classification is apparently based could not reasonably be conceived to be 
true by the governmental decisionmaker.” See Bradley, 440 U.S. at 111. 
 2. Procedural Due Process 

 Plaintiff alleges that that Defendant’s enforcement of Rule 26.11(i)(3) 
violated her due process rights in four ways: 1) “[n]either the court nor ALEA gave 
her notice that her driver’s license could be suspended for nonpayment,” 2) 
“[n]either the court nor ALEA gave her notice . . . that her ability to pay is a critical 

issue in determining the appropriateness of suspension,” 3) “[n]either the court nor 
ALEA . . . conducted an ability to pay hearing prior to the suspension,” and 4) her 
license has been suspended without a finding that she had the ability to pay. (Doc. 

# 1, at 9.) She argues that Rule 26.11(i)(3) is facially unconstitutional because it 
authorizes suspensions without requiring the State to provide these protections. The 
Fourteenth Amendment provides that no State can “deprive any person of life, 

liberty, or property, without due process of law.” U.S. Const. amend. XIV. “In this 
circuit, a § 1983 claim alleging a denial of procedural due process requires proof of 
three elements: (1) a deprivation of a constitutionally-protected liberty or property 

interest; (2) state action; and (3) constitutionally-inadequate process.” Grayden v. 
Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). 
 “Suspension of issued licenses . . . involves state action that adjudicates 
important interests of the licensees. In such cases the licenses are not to be taken 

away without that procedural due process required by the Fourteenth Amendment.” 
Bell v. Burson, 402 U.S. 535, 539 (1971); see also Dixon v. Love, 431 U.S. 105, 112 
(1977). The parties agree that Plaintiff has a property interest in her driver’s license. 

(See Doc. # 16, at 27; Doc. # 21, at 27 (citing Bell, 402 U.S. at 542).) “We thus 
consider whether the procedure used was constitutionally adequate.” Evans v. 
Rhodes, 735 F. App’x 986, 988 (11th Cir. 2018). 
 Notice and hearing are distinct features of due process and are governed by 

different legal standards, but under either standard, Plaintiff was not deprived of due 
process. 
 a. Notice 
 “An elementary and fundamental requirement of due process in any 

proceeding which is to be accorded finality is notice reasonably calculated, under all 
the circumstances, to apprise interested parties of the pendency of the action and 
afford them an opportunity to present their objections.” Mullane v. Cent. Hanover 

Bank & Trust Co., 339 U.S. 306, 314 (1950). The means employed must be those 
that would be used by one “desirous of actually informing” the interested party; a 
“mere gesture” is insufficient. Id. at 315. Plaintiff alleges that Defendant’s 
enforcement of Rule 26.11(i)(3) inflicted two separate notice-related injuries: 

Defendant failed to notify her that 1) her ability to pay is a critical issue in 
determining the appropriateness of suspension and 2) that her license could be 
suspended for nonpayment. 

 “Plaintiff[’s] characterization of the” former notice injury “is founded upon 
an assumption that there is a constitutional right to an indigency determination in the 
first place and that the rights implicated by the suspensions are” important “in a 
constitutional sense.” Mendoza, 358 F. Supp. 3d at 1179. Because the Equal 

Protection Clause does not require the State to consider Plaintiff’s ability to pay 
when determining the appropriateness of suspension, Plaintiff is not entitled to be 
notified of a non-existent right. 
 However, Plaintiff’s second notice injury is not intertwined with her equal 
protection argument. Plaintiff was due some form of notice that she could be 

deprived of her property interest for not paying her traffic fines. However, this claim 
is time-barred. See supra Part V.C. 
 If this claim were timely, it remains unmeritorious because Plaintiff had 

statutory notice that her license could be suspended for nonpayment. See Reams v. 
Irvin, 561 F.3d 1258, 1264–65 (11th Cir. 2009) (“For one hundred years, the 
Supreme Court has declared that a publicly available statute may be sufficient to 
provide [constitutionally adequate] notice because individuals are presumptively 

charged with knowledge of such a statute.” (alteration in original) (quoting Grayden 
v. Rhodes, 345 F.3d 1225, 1239 (11th Cir. 2003))); see also Grayden v. Rhodes, 345 
F.3d 1225, 1239 (11th Cir. 2003) (collecting cases). Plaintiff is presumptively 

charged with knowledge of Rule 26.11’s relevant provisions: that her license was 
subject to suspension if she failed to pay her fines and costs, that the judge at her 
liability hearing should consider her ability to pay, and that he or she should consider 
whether to allow payment on a delayed or installment basis. See Atkins v. Parker, 

472 U.S. 115, 130–31 (1985). The failure of this notice to inform Plaintiff of her 
rights to a hearing is only unconstitutional if Plaintiff has such a right, which is a 
separate issue. See infra Part V.F.2.b. If Plaintiff’s non-Bearden notice claim were 

timely, it would still be subject to dismissal on the merits. 
 b. Opportunity to be Heard 
 Plaintiff claims that she was injured because Rule 26.11(i)(3) authorizes 

suspensions without requiring the State to conduct an ability-to-pay hearing and/or 
to make a finding that she was able to pay prior to her suspension, and the State did 
not take either action. It has already been established that Plaintiff’s license could 

not be taken away without due process, and “[t]he fundamental requirement of due 
process is the opportunity to be heard ‘at a meaningful time and in a meaningful 
manner.’” Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. 
Manzo, 380 U.S. 545, 552 (1965)). But “due process is flexible and calls for such 

procedural protections as the particular situation demands.” Morrissey v. Brewer, 
408 U.S. 471, 481 (1972). The adequacy of the opportunity to be heard is governed 
by weighing the three factors set forth in Mathews: 

 First, the private interest that will be affected by the official action; 
 second, the risk of an erroneous deprivation of such interest through the 
 procedures used, and the probable value, if any, of additional or 
 substitute procedural safeguards; and finally, the Government’s 
 interest, including the function involved and the fiscal and 
 administrative burdens that the additional or substitute procedural 
 requirement would entail. 

424 U.S. at 335. 
 The Supreme Court has held that a “driver’s interest . . . in continued 
possession and use of his license . . . . is a substantial one.” Mackey v. Montrym, 
443 U.S. 1, 11 (1979). As stated in a similar case, there are “no reason[s] to doubt 
Plaintiff[’s] contention that, for many” Alabamians, “the loss of a driver’s license 
negatively impacts individuals’ ability to get to work, make doctor’s appointments, 

go grocery shopping, and more.” Johnson, 381 F. Supp. 3d at 639. So even though 
this interest is not constitutionally important, it is important to individual licensees. 
 Plaintiff’s claim that she was unconstitutionally deprived of an opportunity to 

be heard on the issue of her indigency fails because Mathews’s second factor, the 
risk of erroneous deprivation, is wholly absent. Because Plaintiff’s “indigency is 
not relevant to the State’s underlying decision to suspend [her] license[], . . . giving 
[her] a hearing—or any other procedural opportunity—where [she] can raise [her] 

indigency would be pointless. Such a procedure would do nothing to prevent the 
‘the risk of erroneous deprivation.’” Fowler, 924 F.3d at 259 (quoting Mathews, 
424 U.S. at 335). 

 This case is somewhat analogous to Dixon v. Love, where the appellee’s 
Illinois driver’s license was automatically revoked after receiving his third license 
suspension in ten years. See 431 U.S. at 117 (Stevens, J., concurring). As in Dixon, 
Plaintiff “had the opportunity for a full judicial hearing in connection with each of 

the traffic convictions on which the . . . decision was based.” Id. at 113. Because 
Plaintiff “does not dispute the factual basis” for the decision to suspend her license 
for nonpayment, she “is really asserting the right to appear in person only to argue 

that” the Secretary or a court “should show leniency and depart from [their] own 
regulations. Such an appearance might make the licensee feel that [s]he has received 
more personal attention, but it would not serve to protect any substantive rights.” Id. 

at 114. 
 “The second Mathews factor also looks at the probative value, if any, of 
additional or substitute procedural safeguards.” Mendoza, 358 F. Supp. 3d at 1180. 

The ability-to-pay hearing Plaintiff requests or, for that matter, any additional or 
substitute procedural safeguards that focused on ability-to-pay “would be unlikely 
to have significant value in reducing the number of erroneous deprivations,” see 
Dixon, 431 U.S. at 114, when it is not erroneous for the State to fail to consider 

ability-to-pay.20 

 20 The District of Oregon has published a persuasive explanation on the low risk of 
erroneous deprivation. 

 There is little risk of erroneous deprivation given that the suspensions are triggered 
 by the objective fact of nonpayment of the fines. Mackey v. Montrym, 443 U.S. 1, 
 13 (1979) (upholding license suspension based on “objective facts either within the 
 personal knowledge of an impartial government official or readily ascertainable by 
 him”) . . . . I understand Plaintiffs’ position that the risk of erroneous deprivation 
 is high under the procedures currently used because absent the opportunity to 
 establish indigency, Plaintiffs’ fundamental rights will be wrongfully deprived. 
 But, Plaintiffs’ characterization of the deprivation is founded upon an assumption 
 that there is a constitutional right to an indigency determination in the first place 
 and that the rights implicated by the suspensions are fundamental in a constitutional 
 sense. As stated previously, I disagree with Plaintiffs on this point. I do not intend 
 my conclusion to suggest that I am blind to the fundamental effect that driver’s 
 license suspensions for nonpayment of traffic debt have on Plaintiffs’ lives. I do 
 not underestimate the adverse effects on their employment opportunities, 
 recreational opportunities, access to medical care, and more. But, for the reasons 
 previously explained, I do not find support in the caselaw for concluding that the 
 “Finally, the government has a strong interest in enforcing traffic fines to deter 
continuing traffic violations.” Mendoza, 358 F. Supp. 3d at 1180. “[T]he Supreme 

Court has specifically recognized in the driver’s license revocation context that ‘the 
substantial public interest in administrative efficiency would be impeded by the 
availability of a pretermination hearing in every case.’” Johnson, 381 F. Supp. 3d 

at 644 (quoting Dixon, 431 U.S. at 114); see also Mackey, 443 U.S. at 18 (noting 
that increasing the number of presuspension hearings would “impose a substantial 
fiscal and administrative burden on the Commonwealth”). 
 This is not to say that Alabama licensees may not be due some opportunity to 

be heard on the question of whether their driver’s licenses should be suspended 
pursuant to Rule 26.11(i)(3). Indeed, Bell suggests that “except in emergency 
situations . . . due process requires that when a State seeks to terminate an interest 

such as [suspending a driver’s license], it must afford ‘notice and opportunity for 
hearing appropriate to the nature of the case’ before the termination becomes 
effective.” 402 U.S. at 542 (quoting Mullane, 339 U.S. at 313). The Supreme Court 
allowed the State of Illinois to forgo a pre-deprivation hearing in Dixon because the 

drivers at issue posed a clear danger to public safety, which merited their immediate 

 rights they assert have been recognized as “constitutionally fundamental.” Thus, 
 Plaintiffs’ articulation of the risk of erroneous deprivation is misplaced. 

Mendoza, 358 F. Supp. 3d at 1179 (internal citation and footnote omitted). 
removal from public roads. See Dixon, 431 U.S. at 114–15. But such drivers were 
entitled to a full evidentiary hearing upon request after their licenses were revoked. 

Id. at 109. In light of this caselaw, it is possible that Alabama licensees are at least 
due a process akin to the informal administrative review that Oregonians receive 
after their licenses have been suspended under a similar policy. See Mendoza, 358 

F. Supp. at 1153; see also Ala. Code § 32-5A-195(l), (q) (providing hearing rights 
to individuals whose licenses have been revoked or suspended by the Secretary of 
ALEA for one of the authorized reasons listed in that code section); Burlison, 311 
F. App’x at 209 (holding that due process was satisfied where the appellant “was 

told that he could request an administrative hearing to challenge the suspension”). 
 The State’s current policy is not wholly lacking in procedural safeguards. The 
fine is not imposed until the defendant has been convicted of a traffic violation by a 

court. And the revised ticket language informs each recipient that “[i]f you cannot 
pay any monetary judgment against you in 60 days, you may apply to the court to 
request payment of a monetary judgment in installments. You must obtain a court 
order approving an installment plan and provide proof of financial responsibility and 

such an order” to ALEA within 60 days after judgment is entered to prevent a license 
suspension. Ala. R. Jud. Admin. 19, Attachment One. The State’s instruction that 
a defendant may “apply to the court” for a payment plan does provide some guidance 
for how a defendant may be heard on his or her ability to pay a fine, even though it 
was not provided to Ms. Motley. 

 But the question of what other type of process might be “appropriate to the 
nature of the case” has not been squarely presented in this complaint. (See, e.g., 
Doc. # 1, ¶ 22, at 7 (“There are no provisions for post-suspension process to contest 

the erroneous suspension of a driver’s license because a person could not afford to 
pay the ticket.”).) Plaintiff has offered no other considerations aside from ability-
to-pay that require an opportunity to be heard, and any due process claim divorced 
from her Bearden claim would be untimely. See also supra Part V.F.1.a.1. 

(discussing why Plaintiff’s Turner theory is untimely). 
 Ultimately, Plaintiff is not due an opportunity to be heard on her ability to pay 
nor is she due to receive an express finding of whether her nonpayment was willful. 

All of Plaintiff’s claims fail on the merits. 
 VI. CONCLUSION 
 It is therefore ORDERED that the motion to dismiss (Doc. # 14) is 
GRANTED and that this action is DISMISSED with prejudice. Plaintiff’s motions 

for class certification (Doc. # 5) and for a preliminary injunction (Doc. # 3) are 
DENIED as moot. 
 Final judgment will be entered separately. 
DONE this 31st day of March, 2020. 
 /s/ W. Keith Watkins 
 UNITED STATES DISTRICT JUDGE